UNITED STATES of America, Appellee,

v.

Stephen KRAMER, Appellant.

No. 97, Docket 26294.

United States Court of Appeals Second Circuit.

Argued Oct. 13, 1960.

Decided May 2, 1961.

Magruder, Circuit Judge, dissented in part.

**912**

Cornelius W. Wickersham, Jr., U. S. Atty., E. D. New York, Brooklyn, N. Y. (Judith A. Gelb, Confidential Asst. to the U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

John A. Arcudi, Bridgeport, Conn. (Bernard Green, Bridgeport, Conn., on the brief), for appellant.

Before CLARK, MAGRUDER and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Defendant-appellant Kramer was found by a jury in the Eastern District of New York to be guilty on each of four counts of an indictment. The District Court's ensuing judgment, here under appeal, in addition to imposing a fine of $1,000 on the fourth count, sentenced Kramer "to serve five years on each of the first three counts and 8½ years on the fourth count all to be served concurrently."

Count I of the indictment charged Kramer with an offense under 18 U.S.C. § 371, in conspiring with others, in the Eastern District of New York, to break and enter into the United States post office at Wilton, Connecticut, with intent to commit larceny and other depredations, in violation of 18 U.S.C. § 2115. Count II made a similar charge with respect to the post office at Orange, Connecticut. Count III charged him with an offense under 18 U.S.C. § 371 in conspiring with others to receive, conceal and retain with intent to convert to his own use money, vouchers and things of value of the Post Office Department, knowing them to have been stolen, in violation of 18 U.S.C. § 641. Count IV charged him with the substantive offense of violating 18 U.S.C. § 641 by receiving, concealing and retaining with intent to convert to his own use money, vouchers and things of value of the Post Office Department, knowing them to have been stolen. The two latter counts alleged the property to have a value in excess of $100.

At a previous trial in the District of Connecticut, more fully described hereafter, Kramer had been acquitted on all eight counts of an indictment alleging substantive crimes arising from the same two post office burglaries. In the earlier indictment Counts I and V charged the burglaries, in violation of 18 U.S.C. § 2115; Counts II and VI alleged depredation of the safes at the two post offices, in violation of 18 U.S.C. § 1361; Counts III and VII charged the stealing of property from the two post offices in violation of 18 U.S.C. § 641; and Counts IV and VIII alleged the stealing of registered mail in violation of 18 U.S.C. § 1708.

Kramer appeals from the District Court's overruling of his contention that the Connecticut judgment barred a later prosecution under the clause of the Fifth Amendment forbidding that "any person be subject for the same offence to be twice put in jeopardy of life or limb," and, alternatively, that it precluded the Government from relitigating issues necessarily determined in the earlier trial. We hold the District Court was right as to the former, wrong as to the latter.

## Double Jeopardy

■ Offenses are not the same for purposes of the double jeopardy clause simply because they arise out of the same general course of criminal conduct; they are the "same" only when "the evidence required to support a conviction upon one of them [the indictments] would have been sufficient to warrant a conviction upon the other." Morey v. Commonwealth, 1871, 108 Mass. 433, 434, quoted with approval in Ex parte Nielsen, 1889, 131 U.S. 176, 187–188, 9 S.Ct. 672, 676, 33 L.Ed. 118 and Gavieres v. United States, 1911, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489. Here the gist of the offenses charged in the first three counts of the indictment in the Eastern District was an agreement, an element not required to be proved to convict on the substantive charges in Connecticut. Hence the prior acquittal of the substantive offenses did not make prosecution for the unlawful agreement double jeopardy, even though the Government had offered evidence of such an agreement in the Connecticut trial. United States v. Bayer, 1947, 331 U.S. 532, 541–543, 67 S.Ct. 1394, 91 L.Ed. 1654. See Pinkerton v. United States, 1946, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489; Pereira v. United States, 1954, 347 U.S. 1, 11–12, 74 S.Ct. 358, 98 L.Ed. 435. Similarly conviction for receiving, concealing and retaining stolen goods in violation of 18 U.S.C. § 641 would require proof of something other than participation in the theft—indeed, proof of that would be fatal to a conviction for receiving, Milanovich v. United States, 4 Cir., 1960, 275 F.2d 716, reversed in part 1961, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773. Hence acquittal of the offenses charged in the first indictment would not support a plea of *autrefois acquit* on the receiving charge even though evidence of possession of stolen property after the burglaries had been offered at the first trial.

## Res Judicata

■ Appellant's alternative contention rests on that important principle of the law of judgments, unhappily dubbed "collateral estoppel," which "operates, following a final judgment, to establish conclusively a matter of fact or law for the purposes of a later law suit on a different cause of action between the parties to the original action." [1] It is much too late to suggest that this principle is not fully applicable to a former judgment in a criminal case, either because of lack of "mutuality" or because the judgment may reflect only a belief that the Government had not met the higher burden of proof exacted in such cases for the Government's evidence as a whole although not necessarily as to every link in the chain. Coffey v. United States, 1886, 116 U.S. 436, 442–443, 6 S.Ct. 437, 29 L.Ed. 684 [criminal judgment applied as collateral estoppel in civil case]; United States v. Oppenheimer, 1916, 242 U.S. 85, 87, 37 S.Ct. 68, 61 L.Ed 167; United States v. Adams, 1930, 281 U.S. 202, 205, 50 S.Ct. 269, 74 L.Ed. 807; Sealfon v. United States, 1948, 332 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180; Hoag v. State of New Jersey, 356 U.S. 464, 470–471, 78 S.Ct. 829, 2 L.Ed.2d 913.

■ Application of the principle inevitably has two phases. The first is to determine what the first judgment determined, a process in which, as the Sealfon case makes plain, the court must look not simply to the pleadings but to the record in the prior trial. The second is to examine how that determination bears on the second case.

Here the first phase presents none of the difficulties often encountered with respect to a general verdict of "not guilty" in a criminal case. Despite the multiplicity of counts, the issue in the Connecticut trial was uncomplicated. Post offices at Wilton and at Orange had been burglarized, the former on the night of May 26, 1956, the latter on that of June

1. Polasky, Collateral Estoppel—Effects of Prior Litigation, 39 Iowa L.Rev. 217, 218 (1954).

14. The Government proved the fact of the burglaries and the extent of the damages and theft with thoroughness and detail. The issue for the jury was not whether "jobs" had been done but by whom. The Government's principal witness on this was Herbert Kosmol. He testified, with circumstantiality, that he and Kramer had been partners in a Brooklyn television store; that on May 26 Kramer and one Madonia (tactfully characterized as "deceased" at the time of the trial) induced Kosmol to join them in a plan to burglarize the Wilton post office; that, equipped with tools and a pistol, they drove from Brooklyn to Wilton on the night of May 26; that they broke into the post office, opened the safe, and removed money, stamps, postcards and registered mail; and that they returned to Kramer's home and divided some of the loot, Mrs. Kramer having been awakened to furnish them with coffee. On the night of June 14, Kramer encountered Kosmol in a Manhattan bar, a good deal the worse for drink; he nevertheless urged Kosmol to join him and Madonia in another similar enterprise. Kosmol sobered up enroute to Orange and waited in the car with the pistol, while Kramer and Madonia burglarized the post office; tools were left on the scene. They then returned to Kramer's home where Kosmol was paid the smaller share deemed equitable for his more limited role in this affair. Kosmol also testified he had advised against taking money orders from the Wilton post office, but later learned from Kramer that Madonia had been arrested for passing some and that Mrs. Madonia had threatened that if Kramer didn't get Madonia out on bail, Madonia "was going to start singing." He also found some 40 or 50 postal money orders at the television shop. In addition, the Government offered testimony by Agnes Morra that she had cashed postal money orders received from Madonia, and by Madonia's widow as to statements by Kramer, after her husband had been released on bail, complaining about Madonia's "bringing the girls in" to cash the money orders, and advising Madonia to destroy any money orders that remained, as Kramer had already done.

Kramer denied participation in either burglary. He testified that in April, 1956, he had had an argument with Kosmol about the latter's taking money from the cash box in the television shop, that thereafter Kosmol was inactive in the business, and that Kramer had arranged for Madonia to help him. He admitted seeing money orders after the dates of the burglaries but attributed all this to Madonia. He was subjected to a long cross-examination which succeeded in eliciting, among other things, that on the night of May 26 he was busy repairing televisions and radios in preparation for the Memorial Day weekend, and that he spent the night of June 14 at the home of his sister, helping to prepare for a birthday party the next day. The latter testimony was corroborated by the sister, by her neighbor, and by Mrs. Kramer, who also denied Kosmol's story as to the coffee serving on the night of May 26.

Judge Anderson charged the Connecticut jury, *inter alia*, that it was not necessary for the Government to prove that Kramer personally did every act constituting the offenses charged; it was enough, under the aiding and abetting statute, 18 U.S.C. § 2, that he wilfully participated therein. No claim was made, or charge given, that Kramer might be liable as an accessory after the fact under 18 U.S.C. § 3.

■ There can hardly be mystery as to what was determined by the verdict of "not guilty," general though it was.[2] The jury was asked to determine a single question, of the starkest simplicity: Was Kramer responsible for what happened to the Wilton or Orange post offices on the nights of the burglaries, or wasn't he? Unlike many other criminal cases, this one was devoid of alternative possibilities. Considering the case in the

2. See Lugar, Criminal Law, Double Jeopardy and Res Judicata, 39 Iowa L.Rev. 317, 332–339 (1954).

light of the evidence, it is quite impossible, for example, to explain the acquittal on a basis that although Kramer was at the post offices, he was a bystander or thought his mission innocent, or on a view that although he participated in the planning, he was not sufficiently important, or causative, or guilt-conscious, to be an aider and abetter. The verdict of the Connecticut jury thus settled that Kramer did not burglarize the Wilton and Orange post offices on the nights of May 26 and June 14 and was not responsible for whoever did. And so we turn to the second trial, in the Eastern District.

■ There the Government was permitted to offer testimony by Kosmol and others substantially identical with that given in Connecticut. This evidence was contended to be relevant to the conspiracy counts on the basis that the Government was not limited to the overt acts charged in the indictment, which, doubtless as a bow to the double jeopardy clause of the Fifth Amendment, spoke only of "conversations," meetings, rides back and forth between Brooklyn and Connecticut, and the transmission of money among the conspirators, and carefully eschewed the burglaries themselves; the evidence was contended to be relevant to the receiving count as showing knowledge that the property had been stolen. Seasonable objections that the Government was seeking to relitigate facts conclusively determined against it in the earlier trial were consistently overruled on the basis of the judge's considered view that the difference in the offenses charged relieved the Government of any bar.[3] Kramer did not testify, he having absconded during the trial.

■ Considering the matter "in a practical frame and viewed with an eye to all the circumstances of the proceedings," as the Supreme Court has directed, Sealfon v. United States, supra, 332 U.S. at page 579, 68 S.Ct. at page 240, it would seem rather plain that the admission of evidence showing Kramer's liability as a principal or an aider or abetter to the offenses charged in the first indictment violated the rule, also stated in Sealfon, 332 U.S. at page 578, 68 S.Ct. at page 239, that the Connecticut verdict "operates to conclude those matters in issue which the verdict determined though the offenses be different."

The Government stoutly denies this. Relying on Judge Bryan's phrasing in United States v. Perrone, D.C.S.D.N.Y. 1958, 161 F.Supp. 252, 257–259, it says that even where there was "a definite determination of an issue favorable to the defendant in the prior trial," the principle of conclusiveness applies only if the earlier determination "must be inconsistent with the guilt of the defendant in the subsequent proceeding," or, putting it in another way, on "an issue essential to a conviction in the second trial." If that be so, the Government must prevail; for, as pointed out above, acquittal on the charges of burglary, even as an aider and abetter, would not be necessarily inconsistent with guilt of a conspiracy to burglarize or to receive and surely not with guilt of receiving.

■ We see no basis in reason for a limitation so narrow. A defendant who has satisfied one jury that he had no responsibility for a crime ought not be forced to convince another of this, even in a prosecution where in theory, although very likely not in fact, the Government need not have tendered the is-

---

3. If the admission of the testimony was error, the error was not cured by the judge's including in his charge a statement that "If you find that there was a conspiracy on the part of these three persons to get into those post offices, so far as Kramer is concerned you can consider the conspiracy as having failed in its object * * *" For, apart from the impracticability of any attempt to

erase evidence heard by the jury at such length, the judge's rulings during the trial and the context of his instructions show he had no intention of trying to do so; indeed, he followed the quoted language by telling the jury it could consider the evidence as to the finding of tools at Orange and "Kosmol's testimony as to how they got there."

sue. On the Government's argument, if a postal inspector had been killed during one of the burglaries, Kramer's acquittal would bar, as *res judicata*, a later prosecution for first-degree murder under 18 U.S.C. § 1114, since participation in a burglary would be an essential element of the crime, 18 U.S.C. § 1111; but, in a prosecution for second-degree murder or for manslaughter, the Government would be free, as it claims *a fortiori* to be here, to repeat all the testimony about Kramer's presence on the scene which the Connecticut jury disbelieved, since it would not be essential for the Government to establish burglary in order to convict on the lesser charge. Such a distinction seems utterly captious. More important, to permit the Government to force a defendant who has won an acquittal to relitigate the identical question on a further charge arising out of the same course of conduct, selected by the Government from the extensive catalogue of crimes furnished it in the Criminal Code, would permit the very abuses that led English judges to develop the rule against double jeopardy long before it was enshrined in the Fifth Amendment, 3 Holdsworth, History of English Law, 614,—and still longer before the proliferation of statutory offenses deprived it of so much of its effect. See Mr. Justice Brennan's separate opinion in Abbate v. United States, 1959, 359 U.S. 187, 196, 201, 79 S.Ct. 666, 3 L.Ed.2d 729.[4] The very nub of collateral estoppel is to extend *res judicata* beyond those cases where the prior judgment is a complete bar. The Government is free, within the limits set by the Fifth Amendment, see United States v. Sabella, 2 Cir., 1959, 272 F.2d 206, 211, to charge an acquitted defendant with other crimes claimed to arise from the same or related conduct; but it may not prove the new charge by asserting facts necessarily determined against it on the first trial, no matter how unreasonable the Government may consider that determination to be.

As to authority, the Government asserts a two-fold basis. It would carry into the criminal field this Court's statement in The Evergreens v. Nunan, 2 Cir., 1944, 141 F.2d 927, 152 A.L.R. 1187, that a prior judgment is conclusive only as to facts that are "ultimate" rather than "mediate" in the subsequent proceeding, adopted in the American Law Institute Restatement of Judgments, § 68, Comment p, which, however, was expressly stated as not intended to deal with the effect of a criminal judgment (scope note, p. 2). And it claims the support of decisions of the Supreme Court. These contentions require thorough analysis.

This Court's statement in The Evergreens v. Nunan, supra, must be read in context. On March 1, 1913, The Evergreens owned some 4,049,000 square feet of land, of which some 2,638,000 square feet had been improved as cemetery lots and 1,411,000 were only partially improved. Sales had averaged 61,630 square feet per year. In the prior decision, the Board of Tax Appeals had found the March 1, 1913, value of some 246,000 square feet of improved lots, sold in the five years 1929 to 1933, to be $1.55 per square foot; this figure was computed on the basis of "actual sales over a reasonable period prior to the basic date." The second case, 1942, 47 B.T.A. 815, concerned the March 1, 1913, value of some 39,000 square feet of improved lots sold in 1934 and 1935 and of 327,000 square feet of partially improved land sold to the City of New York as a single tract for park purposes in 1934. The taxpayer claimed the earlier decision had conclusively determined the value of all the improved lots to be $1.55 per square foot, hence the March 1, 1913 value of all the partially improved lots was the same less the cost of improvement at that time.

Never was there a wilder pair of *non sequiturs*. The first proceeding had determined the March 1, 1913 value of the 246,000 square feet of improved lots there involved; it precluded the Govern-

---

4. See also McLaren, The Doctrine of Res Judicata as Applied to the Trial of Criminal Cases, 10 Wash.L.Rev. 198 (1935); Note, Res Judicata and Double Jeopardy in Indiana Criminal Procedure, 33 Ind.L.Rev. 409, 419 (1958).

ment and the taxpayer from ever challenging that, and, perhaps more broadly, the Government from denying that other small quantities of improved lots could have been sold in 1913 for $1.55 per square foot and the taxpayer from asserting they could have been sold for more. That was all. It did not determine that the whole vast acreage of improved lots could have been sold for $1.55, still less that all the partially improved land also could have been sold for that price if it had then been fully improved. The Board of Tax Appeals thus paid ample respect to collateral estoppel when it used the $1.55 figure for the improved lots sold in 1934 and 1935 and determined the March 1, 1913, value of the partially improved lots by a method which discounted anticipated future sales to their March 1, 1913 value.

 Believing the case to present a novel question, 141 F.2d at pages 928, 930–931, this Court chose to place its approval of the Board's ruling on the basis that the value of the small acreage of improved lots in the first case was not a fact "ultimate" in the second, "ultimate" facts being those "upon whose combined occurrence the law raises the duty, or the right." It may be doubted whether the Court intended to establish this as a rigid rule even in civil cases; the Court's concern was to put a limit on such an extension of collateral estoppel, well illustrated by the taxpayer's extreme claim, that "the loser's risks become enormously enlarged". One advantage of the "ultimate" fact test was thought to be that under it "the causes of action to which it [collateral estoppel] can apply are apt to be already in existence." More recently, a Court of Appeals has stated the limitation somewhat differently—collateral estoppel applies "when it is evident

from the pleadings and record that determination of the fact in question was necessary to the final judgment [in the first case] and it was foreseeable that the fact would be of importance in possible future litigation." Hyman v. Regenstein, 5 Cir., 1958, 258 F.2d 502, 511. And the peculiar applicability of collateral estoppel to successive actions "growing out of the same transaction" has long been recognized, Keokuk & Western R. Co. v. State of Missouri, 1894, 152 U.S. 301, 314–316, 14 S.Ct. 592, 597, 38 L.Ed. 450, citing City of Davenport v. Chicago, Rock Island & P. Ry., 1874, 38 Iowa 633, 640.[5]

 Whatever the force of The Evergrens v. Nunan and its repetition in the Restatement may be in civil cases, the statement ought not be literally applied to criminal judgments. Professor Scott, one of the co-reporters of the Restatement, has wisely remarked that the application of *res judicata* in criminal cases presents "questions of policy quite different from those applicable to civil proceedings," 39 Iowa L.Rev. 214, 216. The reason underlying the limitation in The Evergreens v. Nunan is respected, even if the precise words may not be, when collateral estoppel is applied in a second criminal trial relating to the same course of conduct as the first. That is is far as we need go in this case; we are not required to decide what the result should be in cases, perhaps more likely to be found in law reviews than in life, where the second charge is for an unrelated crime as to which the locus of the defendant at the time of the first may be relevant, e. g., if Kramer had been indicted, 18 U.S.C. § 1201, for an interstate kidnapping from Wilton on the night of May 26.[6]

5. See also Developments—Res Judicata, 65 Harv.L.Rev. 818, 840–843 (1952); Note, Collateral Estoppel by Judgment, 52 Colum.L.Rev. 647, 662–663 (1952) [stating that whether the rule of The Evergreens v. Nunan "is well designed to achieve its purpose must * * * await greater experience in its use" and that "the second circuit now is alone in

applying the new rule"]; Polasky, supra note 1, at 237–239; and the comment on Polasky's article by Professor Scott that the rules of collateral estoppel "are not hard and fast rules, but have considerable flexibility," 39 Iowa L.Rev. 214–215 (1954).

6. See Lugar, supra, at 335–339.

We have found no decision by a Court of Appeals in which the statement in The Evergreens v. Nunan has been applied to permit what was allowed here, and there are several to the contrary. The leading case is United States v. De Angelo, 3 Cir., 1943, 138 F.2d 466, written by Judge [later Chief Justice] Jones six months before The Evergreens, and cited by the Supreme Court in Sealfon, 332 U.S. at page 578, 68 S.Ct. at page 239, 92 L.Ed. 180. This was followed in United States v. Simon, 3 Cir., 1955, 225 F.2d 260.[7] Yawn v. United States, 5 Cir., 1957, 244 F.2d 235, like De Angelo, prohibited the introduction of evidence of commission of a substantive offense of which the defendant had been acquitted, to support a conspiracy charge.

Only two Supreme Court decisions since Sealfon require discussion. The first is United States v. Williams, 1951, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758, in which three opinions were written. Mr. Justice Frankfurter's opinion, for four Justices, affirming a quashing of the indictment by the Court of Appeals, did not reach the point pertinent here; Mr. Justice Black concurred that the indictment had been properly quashed since he deemed the former acquittal on the substantive charge a complete bar, as in Sealfon; the Government's reliance must therefore be on a portion of Mr. Justice Douglas' dissent, 341 U.S. at pages 95–96, 71 S.Ct. at pages 594–595, for four Justices. In view of the posture of the case, that dissent was addressed only to Mr. Justice Black's position that the former acquittal required quashing of the indictment; there was no occasion for Mr. Justice Douglas and his colleagues to consider whether the admission of evidence of facts conclusively determined for the defendants at the trial on the substantive charge would have required a new trial on the conspiracy

indictment if the dissenters' view as to the sufficiency of the indictment had prevailed, and we do not read the opinion as doing so.

The other Supreme Court decision is Yates v. United States, 1957, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356, which, in the discussion of defendant Schneiderman's appeal, twice cited The Evergreens v. Nunan, supra. The first citation, 354 U.S. at page 336, 77 S.Ct. at page 1086, was simply to the point that the doctrine of collateral estoppel "makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were essential to the decision" in the first case, a requirement clearly met here. The second, 354 U.S. at page 338, 77 S.Ct. at page 1087, repeated the statement in The Evergreens and of the Restatement with respect to ultimacy as "The normal rule," but considered it sufficient to hold that "the matters of fact and mixed fact and law" determined in the prior opinion, namely, that in 1927 Schneiderman had not adopted an interpretation of Communist party teaching featuring agitation and exhortation calling for present violent action, or even that the party itself had not advocated that, "were so remote from the issues" as to what Schneiderman was doing in 1948–1951 as not to demand any instructions to the jury with respect to the prior judgment. This is a long way from indicating an intention to permit the Government to submit proof of substantive offenses of which the defendant has been acquitted, in support of charges for conspiracy and another substantive offense arising out of the same course of conduct.

■ There remains the question whether we should order a new trial, with the Government prohibited from offering evidence which, if believed, would necessarily lead to the conclusion that Kramer participated in the burgla-

---

7. We cannot agree with the suggestion, Note, Collateral Estoppel in Criminal Cases, 28 U. of Chi.L.Rev. 142, 145 (1960), that the authority of the De Angelo and Simon decisions has been affected by United States v. Kenny, 3 Cir., 1956, 236 F.2d 128, or with the government's contention that they have been weakened, at least as regards prior determinations of fact, by United States v. Waldin, 3 Cir., 1958, 253 F.2d 551.

ries, either directly or as an aider or abetter, or whether we ought to direct a judgment of acquittal. We think the latter is the proper course on the counts charging a conspiracy to break and enter, the former with respect to Count IV, charging the substantive offense of receiving etc. and Count III, charging a conspiracy to receive.

The problem with respect to the first two conspiracy counts is, in a sense, the converse of Sealfon v. United States, supra. There the acquittal for conspiracy came first, here the acquittal on substantive charges. Recognizing that, in theory, an acquittal of conspiracy, which demands proof of agreement, is not inconsistent with conviction on a substantive charge, which does not, 332 U.S. at page 578, 68 S.Ct. at page 239, the Supreme Court nevertheless held that, on the facts in Sealfon, "the earlier verdict precludes a later conviction of the substantive offense," 332 U.S. at page 580, 68 S.Ct. at page 240, since "the core of the prosecutor's case was in each case the same." Here also, although, in theory, acquittal of the substantive charges of burglary, which demanded proof the criminal acts were done, is not inconsistent with a conviction of conspiracy to burglarize, which demands only proof of an agreement and a single overt act, "the core of the prosecutor's case was in each case the same." The evidence to prove the conspiracy to burglarize, if believed, showed that Kramer was not just a person who agreed the burglaries should be committed; even the portion of the testimony that related only to conversations showed Kramer to be one who "counsels, commands, induces or procures" the criminal acts, 18 U.S.C. § 2,— indeed, on that testimony, Kramer was one of the principal guiding forces. Yet this is exactly what the Connecticut judgment precludes the Government from seeking to prove. Hence the case is unlike United States v. Williams, supra, where the defendants acquitted on the previous trial of the substantive charge were secondary figures, 5 Cir., 179 F.2d 644, 646, who, as Mr. Justice

Douglas thought, "may have conspired to do the act without actually aiding in its commission," 341 U.S. at page 95, 71 S.Ct. at page 595. That a quashing of these conspiracy counts is the proper course seems indicated not only by Sealfon but by Judge Thacher's decision in United States v. Meyerson, D.C.S.D.N.Y. 1928, 24 F.2d 855, 857, and by Cosgrove v. United States, 9 Cir., 1954, on rehearing 1955, 224 F.2d 146, just as reversal and remand was the appropriate course in De Angelo and Yawn where there was evidence of the conspiracy other than that whose introduction was forbidden because of the prior acquittal.

Count IV, charging the knowing receipt, retention and concealment of stolen property, and Count III, charging a conspiracy to commit this offense, stand differently. Although certain evidence on this subject was before the Connecticut jury, the acquittal on the substantive counts there did not necessarily involve a determination that Kramer did not knowingly receive, conceal or retain stolen property after the burglaries or agree after the burglaries to do so. The evidence offered in the Eastern District, other than evidence that would show Kramer to have been guilty of the burglaries as a principal or an aider or abetter, sufficed for submission of these Counts to a jury. We realize that to sanction a trial as a receiver of a man whom the Government believes to be the thief takes us near the field recently plowed in Milanovich v. United States, supra. However, here a new trial will be in a context where, as a result of Kramer's having successfully invoked the Connecticut acquittal, all charges and evidence that he was a thief will be excluded. Assuming that, as said in United States v. De Angelo, 138 F.2d at page 468, there can be no "requirement of mutuality with respect to a criminal judgment's conclusiveness" in such a sense as to deprive an accused of "a trial de novo of the facts alleged and offered in support of each offense charged against him and to a jury's independent finding with respect thereto," an accused

who avails himself of collateral estoppel to exclude all evidence of his thievery can hardly be heard to assert that very fact as a defense to another charge.

### The Value of the Stolen Money Orders

We turn finally to another point urged by appellant which is likely to arise on a new trial. 18 U.S.C. § 641 limits punishment for the offenses there specified where "the value of such property does not exceed the sum of $100" [8] to a fine of not more than $1000 or imprisonment for not more than one year—hence a misdemeanor rather than a felony, 18 U.S.C. § 1. Appellant claims blank money orders cannot have a value exceeding $100.

The stolen money orders were printed forms with three sections—the working portion in the center, which is negotiated, and two stubs, one for the post office files and the other for the purchaser. Printed below the caption "United States Postal Money Order" are the words "Maximum value one hundred dollars." There are blanks in which the issuing office is to place the amount of the order, a restrictive stamp ("Not valid for more than ......... dollars"), the name of the payee, the name and address of the purchaser, the stamp of the issuing office, and the initials of the issuing employee. None of these blanks were filled when the money orders were stolen. Kosmol testified in the Eastern District that he and Kramer "devised a way" to make stamps indicating an issuing office.

Agnes Morra testified that when she first saw the money orders prior to cashing, they were stamped with a Brooklyn post office stamp and a $100 restrictive limitation in red, both apparent on the eleven money orders received in evidence, and that Madonia then filled out the payee and purchaser blanks with fictitious names and made the amount $100. Two hundred and twenty-two postal money orders had been stolen; [9] the Government proved that eleven, each for $100, had been cashed, five by Agnes Morra with tradesmen and six with airlines.

Despite the statutory reference to "face" value, see Tinder v. United States, 4 Cir., 1951, 193 F.2d 720, 722, reversed on other grounds 1953, 345 U.S. 565, 73 S.Ct. 911, 97 L.Ed. 1250, it would be hard to sustain the thesis that the presence of the printed legend "Maximum value one hundred dollars" alone made that the "face" value, when neither the restrictive stamp, the stamp of the issuing office, nor the initials of the issuing employee had yet been affixed. On the other hand, despite some inferences that might be drawn from the omission in the second paragraphs of 18 U.S.C. §§ 2314 and 2315 of the value test contained in the first, it does not follow that a stolen blank money order can never be worth more than the nominal value of the paper. This is not a case where the proof is that the defendant merely received a single blank money order; the evidence would permit a jury to find that Kramer received a considerable number

8. The text reads:

"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

"Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."
Cf. 18 U.S.C. §§ 1708, 2311, 2314, 2315, 2316, 2317.

9. As we read the record, these were from the Orange post office, whereas the dates alleged in Count IV all preceded the burglary at Orange. However, the dates were stated to be "approximate" and defendant was not prejudiced by any variance.

of such orders and held them while they were placed in a form that made them negotiable for $100 each. It is not essential that the stolen property be worth $100 at the moment of receipt; it is enough if there is evidence that the property had that value at some time when there occurred an offense defined in the statute, charged in the indictment, and proved by the evidence. Concealing or retaining, with the requisite intent, is an offense equally with receiving. Here there was ample evidence to warrant a conclusion that at some time while Kramer was concealing or retaining the money orders with intent to convert them to his own use, they attained a value of $100 in the aggregate. Although, in contrast to 18 U.S.C. §§ 2314 and 2315, the section of the Criminal Code here in question does not make value in excess of a certain figure an element of the crime but rather a fact going only to the degree of punishment, we assume the Sixth Amendment entitles a defendant to have that fact determined by the jury rather than by the sentencing judge. There is, of course, a certain incongruity in asking a jury to exercise such expertise in the ways of the underworld as to determine the "value" of money orders that can be or have been forged; but the omniscience of the jury extends to harder questions than that. The judge should instruct the jury to find whether Kramer is guilty of the offense charged and, if so, whether at any time when Kramer received or was concealing or retaining the stolen property with intent to convert it to his own use and knowing it to have been stolen, the property as a whole, in the condition in which it had been placed, had a value of $100.[10]

The judgment of conviction is reversed with directions to enter a judgment of acquittal on Counts I and II, and to order a new trial on Counts III and IV at which the court will exclude all evidence which, if believed, would necessarily show Kramer to be a principal or an aider or abetter in the burglaries.

MAGRUDER, Circuit Judge (dissenting).

I think it is clear that the sentence imposed upon the conviction on Count IV cannot stand because of a fatal error in the instructions of the trial court thereon. The substantive offense with which Count IV deals is found in 18 U.S.C. § 641, as follows:

"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

"Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."

The evidence showed that the principal property stolen from the Wilton post office which the defendant was charged

---

10. We add for completeness that we find no merit in appellant's objections to the use made of the postal inspectors' contemporaneous notes of the inspections made by them immediately after the burglaries. Since the inspectors themselves testified, no hearsay problem was presented, Klein v. United States, 8 Cir., 1949, 176 F.2d 184, 188, certiorari denied, 1949, 338 U.S. 870, 70 S.Ct. 145, 94 L. Ed. 533, and it is thus altogether unnecessary to consider whether the notes would be admissible under 28 U.S.C. §§ 1732 or 1733. 3 Wigmore, Evidence (3d ed.), § 737(2).

with having received was postal money orders in blank. There was also some evidence that certain other property had been stolen, but the jury was instructed that it was not required to believe that the defendant was the recipient of these additional articles. The judge's charge to the jury permitted it to find Kramer guilty if he received the blank money orders alone. He told the jury as a matter of law that these blank money orders had a value in excess of $100.

Such valuation was based upon the fact, according to the evidence, that at a later date Kramer exercised his skill as a forger in filling in the blank money orders to the value of $100 each. This forgery of course was a separate offense under 18 U.S.C. § 500. It was in evidence that the defendant Kramer cashed or passed on the forged money orders for the amount of $100 each. But it seems obvious to me, from a reading of 18 U.S.C. § 641, that the stolen property which has to be "received" must have a particular face value at the time it is taken, in order to make out a felony under the second paragraph of that section; and although this paragraph also defines the crime of retaining the same, with intent to convert it to the accused's own use, I take it "the same" must refer to the property of the stated value at the time it was stolen. The trial judge referred to uncontroverted testimony to the effect that:

"[S]everal of those money orders were cashed. Now, to my mind that means that the element of value contemplated by the statute was imported into those blanks, and then the blanks were put into circulation, and you will recall, as to one of them, and I have forgotten which one it was now—you can see how much value it had to that young woman who was, I think, in the ticket office of one of the airplane companies, when there was deducted from her pay the sum of $100 that was advanced in the belief that that money order was an authentic thing.

"It seems to me that within the law the testimony in this case indicates that a potential value which those blanks possessed became a practical value in the hands of whoever issued those and put those into circulation."

A single blank money order may well be worth more than the mere piece of paper on which it is written; but as a matter of law how can it be said to have a value of whatever amount was later forged into it? At the very least the trial judge should have left to the jury to determine whether the value of the property received by the defendant was in excess of $100. In the absence of such a determination, the prison sentence of eight and one-half years on Count IV is not authorized by law for the particular violation of 18 U.S.C. § 641.

There was also a valuation problem in Count III, which charged the defendant with conspiracy to convert to his own use money, vouchers and other things of value knowing them to have been stolen. The second paragraph of 18 U.S.C. § 371 provides that if the offense, "the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor." The inaccuracy of the charge with reference to the valuation of the blank money orders does not constitute prejudicial error, because there was abundant undisputed evidence that other articles of a value in excess of $100 had been stolen from the two post offices.

With regard to the convictions on the first three counts, charging conspiracy merely, appellant raised in many adequate ways the defenses of double jeopardy and of *res judicata*. There is somewhat of an affinity between these two defenses; but the defense of double jeopardy involves a constitutional right under the Fifth Amendment of the Constitution, and the defense of *res judicata* is solely a judge-made concoction.

I entirely agree with the court that the defense of double jeopardy has not been

established, for the reasons that the court gives.

Concerning the defense of *res judicata*, I part company with my brethren. The Third Circuit stated, in United States v. De Angelo, 1943, 138 F.2d 466, 468, that an accused person was constitutionally entitled to a jury trial *de novo* on the facts alleged in support of each offense charged against him. If that is so, it is evident that, as applied to criminal cases, the judge-made doctrines of collateral estoppel cannot be a two-way street. I have found no Supreme Court case giving us any light or leading as to the extent to which civil law doctrines of *res judicata* are to be applied to criminal cases because of this lack of mutuality. Considering that the defense of collateral estoppel is purely a judge-made creation, the courts can mold these doctrines as they please in criminal cases. We cannot say that the doctrines of collateral estoppel have no application at all to criminal proceedings, having in mind Hoag v. State of New Jersey, 1958, 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913; Yates v. United States, 1957, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356; Sealfon v. United States, 1948, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180; United States v. Oppenheimer, 1916, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161. But how far those doctrines of collateral estoppel are to be applied is the question in this case.

The opinion of the court points out that the American Law Institute has said that its Restatement of Judgments relates to civil cases, not criminal cases. Therefore § 68, Comment p, as revised in 1948, can have no direct relevance to the case at bar. Nor can our decision in The Evergreens v. Nunan, 2 Cir., 1944, 141 F.2d 927, 152 A.L.R. 1187, have a direct bearing, for that was certainly a civil case. But in view of the lack of mutuality in these cases, it seems to me entirely reasonable to hold that the doctrines of collateral estoppel in criminal cases should be at least no broader than such doctrines in civil cases, and therefore that the distinction between the determination of an ultimate fact and of an evidentiary or mediate fact should be controlling in a criminal case. This must be what the Supreme Court had in mind in Yates v. United States, supra, 354 U.S. at page 338, 77 S.Ct. at page 1087, a criminal case, when it stated: "The normal rule is that a prior judgment need be given no conclusive effect at all unless it establishes one of the ultimate facts in issue in the subsequent proceeding. So far as merely evidentiary or 'mediate' facts are concerned, the doctrine of collateral estoppel is inoperative. The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 152 A.L.R. 1187; Restatement, Judgments § 68, Comment p."

I do not think that the other points raised by appellant are well taken or deserving of enumeration or discussion.

Since it is the primary function of the trial judge to impose an appropriate sentence, I think we should set aside the whole judgment below and remand the case to the District Court for resentencing in accordance with law. See Gonzalez v. United States, 1 Cir., 1957, 247 F.2d 489, certiorari denied 1958, 356 U.S. 913, 78 S.Ct. 672, 2 L.Ed.2d 586.