STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROBERT J. CORMIER, DEFENDANT-APPELLANT.

Argued January 10, 1966—Decided March 21, 1966.

Mr. *Louis Santorf* argued the cause for appellant.

Mr. *Archibald Kreiger,* Assistant Prosecutor, argued the cause for respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

The opinion of the Court was delivered by

JACOBS, J. The defendant Robert J. Cormier was acquitted on a conspiracy charge that he and James P. Butler had unlawfully agreed to obtain loans from the Franklin Bank and the First National Bank of Passaic County through false statements regarding his company's financial condition. He was later tried and convicted on the substantive charge of unlawfully having obtained loans from the Franklin Bank through such false statements. The question before us is whether the conviction may be permitted to stand in the light of the principles of double jeopardy and *res judicata* or collateral estoppel.

Cormier and Butler were president and treasurer, respectively, of Miller and Van Winkle Company, a corporation engaged in manufacturing springs, presses and a machine to process a foam plastic. The machine was marketed under various names, the largest and most expensive being known as Millatron. From time to time the company received purchase orders which were generally filled from available stock. When stock was unavailable and particularly when manufacture of a Millatron or other large machine was called for, a considerable time might elapse between receipt of the purchase order from the customer and the manufacture and shipment of the ordered merchandise. Upon shipment, the customer would be billed by means of an invoice which would be recorded on the company's books as an account receivable.

In November 1960 the company was in urgent need of financing. Though its purchase orders on hand amounted to several hundred thousand dollars, it had little in the way of accounts receivable available for use as collateral for loans. Butler testified that the company's purchase orders included orders from General Electric Company and from another reputable firm called Horrocks-Ibbotson Company, and that Cormier suggested that these be used as "receivables to back up" a $50,000 loan from the Franklin Bank. Earlier, in May 1960, the Franklin Bank had made a $25,000 loan secured by a purchase or production order, and it had also made an unsecured loan in the sum of $6500 which the company later repaid. After some discussion, the Franklin Bank agreed to extend credit to the company in the sum of $50,000 on the security of accounts receivable. Of this sum $25,000 was to be used to pay off the May 1960 loan. On November 16, 1960 the loan was made and the May 1960 loan was repaid. A promissory note in the face amount of $50,000 was signed by the company through Cormier and Butler as officers and was delivered to the bank along with their personal guarantees, an assigned account loan agreement, and a schedule of invoices which listed accounts receivable from General Electric Company and Horrocks-Ibbotson Company (later replaced by receivables from the Mengel Company) in the aggregate sum of $62,580. In fact there were no such accounts receivable though the testimony indicated that purchase orders in the stated amount from the named concerns were on hand. On December 28, 1960, a comparable transaction resulting in a loan of $80,520 from the First National Bank of Passaic County was entered into; since it did not vary in any pertinent respects from the Franklin Bank transaction, its details need not be set forth here.

In March 1961 the company filed a petition for reorganization under Chapter XI of the Bankruptcy Act. Since the receivables which had been given as security were nonexistent, the banks had no priority over other general creditors and although they have received something on account, they have

nonetheless suffered substantial loss. In due course the matter was presented to the Passaic County Grand Jury which returned three indictments. Indictment No. 909-61 was a conspiracy indictment which charged that Cormier and Butler had unlawfully agreed to obtain loans through false statements regarding "the financial condition or means and ability of the Miller and Van Winkle Company to pay;" the indictment set forth two pertinent overt acts, namely, (1) the delivery on November 16, 1960 to the Franklin Bank of false and fictitious accounts receivable to secure a loan from that bank in the sum of $50,000, and (2) the delivery on December 28, 1960 to the First National Bank of Passaic County of false and fictitious accounts receivable to secure a loan from that bank in the sum of $80,520. Indictment No. 911-61 charged Cormier and Butler with having made false statements on November 16, 1960 to the Franklin Bank with respect "to the financial condition or means and present ability of the said Miller and Van Winkle Company to pay" for the purpose of obtaining the $50,000 loan. Indictment No. 912–61 charged Cormier and Butler with having made false statements on December 28, 1960 to the First National Bank of Passaic County with respect to the company's financial condition for the purpose of obtaining the $80,520 loan. The conspiracy indictment was brought under *N. J. S.* 2A :98–1 whereas the other indictments were brought under *N. J. S.* 2A :111–8.

In May 1963 the State moved to sever as to Butler since he was to be one of the State's witnesses. This motion was granted without objection and the State then sought to consolidate the three indictments for trial. In support of consolidation the State represented to the trial judge that "the facts that will be adduced at this trial, if only the conspiracy indictment is moved, will be the same facts that will be adduced in regard to the other two indictments that the State intends to move for trial, namely indictment number 911–61 and indictment 912–61. These three indictments, if your honor please, are based on the same facts and circumstances."

The defendant objected to consolidation and after hearing argument the trial judge announced that the trial of "the conspiracy indictment alone" should first proceed.

The conspiracy trial began on May 27, 1963 and concluded on June 5, 1963. The State's witnesses included Butler, officers of the Franklin Bank and the First National Bank of Passaic County and others. The defendant Cormier testified on his own behalf. The burden of his defense was that the loans were made by the banks on the security of purchase orders rather than accounts receivable, that the purchase orders were *bona fide* and on hand, that there was no intent on his part to defraud, and that Butler was the one responsible for the forms of the instruments executed in connection with the loans. In his charge, the trial judge set forth the State's contention that the loans were obtained on the security of invoices which were false and fictitious, and the defendant's contention that "the terms agreed upon" for the loans were "accounts which he described as orders then on hand, orders then in the process of manufacturing." The judge told the members of the jury that they should resolve and determine the factual issue which he considered as crucial and which he described as "a narrow and simple one," namely, "What were the terms upon which each loan was granted, as contended by the State, or as contended by the defendant?" Although the testimony supported by the documentary evidence would seem to have left little doubt on this score, the jury returned a verdict of not guilty which is, of course, not subject to reopening.

After the not guilty verdict was returned on the conspiracy indictment, the defendant moved to dismiss the remaining indictments. His motion papers set forth that the indictments arose out of the same facts and circumstances, all of which were presented during the conspiracy trial. At the argument on his motion he stressed that during the conspiracy trial there was no dispute as to Cormier's instructions to Butler "to submit these things," and that his whole defense centered upon his contention "that the loans were granted

upon purchase orders that were actually in existence." In denying the motion, the trial judge took the position that the acquittal meant only that Cormier and Butler had not entered into any unlawful agreement or conspiracy between themselves and did not amount to a finding that Cormier had not alone committed the overt acts of obtaining the loans on the security of false and fictitious accounts receivable.

When the defendant sought leave from the Appellate Division to appeal from the denial of his motion, the State acknowledged that the question was "a very close one" but urged that leave to appeal should be denied without prejudice to the defendant's right to renew his motion to dismiss at the trial on the substantive charge. The Appellate Division denied the leave sought and thereafter the State moved the trial of indictment No. 911–61. This trial began on October 5, 1964 and concluded on October 9, 1964, the evidence was substantially the same as that introduced with respect to the Franklin Bank loan during the conspiracy trial, a motion to dismiss on the basis of the earlier acquittal was denied, and the matter was submitted to the jury which returned a verdict of guilty. The defendant was sentenced to a 1-2 year prison term which was suspended and he was fined $1,000. He appealed to the Appellate Division and we certified before argument there.

■■ The courts in our State and elsewhere have long adhered to the doctrine that conspiracy to commit a crime is a separate and distinct offense from the substantive crime committed pursuant to the conspiracy. See *State v. Chevencek,* 127 *N. J. L.* 476 *(Sup. Ct.* 1941) ; *State v. Oats,* 32 *N. J. Super.* 435 *(App. Div.* 1954) ; see also *Callanan v. United States,* 364 *U. S.* 587, 81 *S. Ct.* 321, 5 *L. Ed. 2d* 312 (1961) ; *Pinkerton v. United States,* 328 *U. S.* 640, 66 *S. Ct.* 7180, 90 *L. Ed.* 1489 (1946). In *Callanan,* Justice Frankfurter defended this doctrine on considerations apart from precedent and logic ; he pointed out that partnership in crime presents a greater potential threat to the public than does the individual act of criminality and that the law may properly

treat the unlawful confederation as an evil in itself, independently punishable as such. See *State v. Oats, supra,* 32 *N. J. Super.,* at *p.* 440. Under this approach the State here was within its rights in seeking separate indictments against Cormier and Butler for the conspiracy and the substantive violations; and in moving to consolidate the indictments for single trial the State sought to obviate the charges of governmental harassment and oppression which flow from repeated prosecutions for the same wrongful conduct. See *State v. Roller,* 29 *N. J.* 339, 344 (1959); see also *Petite v. United States,* 361 *U. S.* 529, 80 *S. Ct.* 450, 4 *L. Ed.* 2d 490 (1960); *Marakar v. United States,* 370 *U. S.* 723, 82 *S. Ct.* 1573, 8 *L. Ed.* 2d 803 (1962).

In *Petite* the defendant was convicted of conspiracy to make false statements to an agency of the United States at hearings in Philadelphia and Baltimore; he was later indicted for suborning the perjury of two witnesses at the Baltimore hearing. The testimony of these witnesses was among the overt acts relied on in the conspiracy proceeding. The defendant's plea of double jeopardy was rejected by the trial court and he was convicted of subornation. Before the Supreme Court, the Solicitor General moved to have the matter remanded so that the indictment for subornation could be dismissed; he did this because of the general policy of the Federal Government "that several offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions, a policy dictated by considerations both of fairness to defendants and of efficient and orderly law enforcement." 361 *U. S.,* at *p.* 530, 80 *S. Ct.,* at *p.* 451, 4 *L. Ed.* 2d, at *p.* 492. The case was remanded in a *per curiam* with several members of the Court filing a separate opinion in which they expressed the view that the second prosecution was in any event barred by the double jeopardy clause of the fifth amendment. 361 *U. S.,* at *p.* 533, 80 *S. Ct.* 450, 4 *L. Ed.* 2d, at *p.* 493; see Note, "Twice in Jeopardy," 75 *Yale L. J.* 262 (1965).

In *Marakar* the defendants were indicted for conspiracy to import opium and for the substantive offense of importing opium. They were first tried for the conspiracy and at the close of the Government's case the trial judge granted motions for acquittal on the ground that no proof of concerted action between the defendants had been shown. The Government then tried and convicted the defendants of the substantive offense. In the Court of Appeals, the defendants' plea of double jeopardy was rejected on the ground that the conspiracy and the substantive crime were separate and distinct offenses and the acquittal of one did not bar conviction of the other. 300 *F. 2d* 513, 515 (3 *Cir.* 1962); see *United States v. Kramer*, 289 *F. 2d* 909, 913 (2 *Cir.* 1961); *State v. Oats, supra*, 32 *N. J. Super.*, at *p.* 440. The defendants' additional plea of *res judicata* or collateral estoppel was rejected on the ground that the record showed that the trial court had granted the motion for acquittal on the conspiracy charge solely because the evidence of "concert of action" between the defendants was insufficient as a matter of law. 300 *F. 2d*, at *p.* 515–516. Because of the governmental policy expressed in *Petite*, the Solicitor General moved before the Supreme Court that the matter be remanded to the District Court with direction that the substantive charge be dismissed; that was done with several members of the Court reiterating their view that the double jeopardy clause barred the second prosecution. 370 *U. S.* 723, 82 *S. Ct.* 1573, 8 *L. Ed. 2d* 803.

In *United States v. Jones*, 334 *F. 2d* 809 (7 *Cir.* 1964), the defendant was indicted, tried and convicted of substantive violations of the narcotic laws. Thereafter he was indicted for conspiracy to violate such laws. He moved to dismiss the conspiracy indictment on the ground of double jeopardy but his motion was denied and he was convicted. On appeal, he pointed out that both indictments concerned the same criminal conduct and that no offense had occurred after the first trial; the Court of Appeals nonetheless sustained the conspiracy conviction on the ground that *Petite* and *Marakar* had

not nullified the established law that "substantive and conspiratorial acts are separate and distinct offenses" and that, while the Solicitor General had moved in *Petite* and *Marakar* to vacate the later convictions, he had not done so in *Jones.* 334 *F. 2d*, at *p.* 812. Although further review was sought by the defendant, his petition for *certiorari* was denied by the Supreme Court. 379 *U. S.* 993, 85 *S. Ct.* 707, 13 *L. Ed. 2d* 613 (1965). See also *United States v. Thomas,* 342 *F. 2d* 132 (6 *Cir.*), *certiorari* denied, 382 *U. S.* 855, 86 *S. Ct.* 105, 15 *L. Ed. 2d* 92 (1965).

Rules dictating compulsory joinder of all known offenses based on the same conduct or arising from the same criminal episode have been proposed and adopted elsewhere. See *Model Penal Code* § 1.07(2) (Proposed Official Draft 1962) ; Note, *supra,* 75 *Yale L. J.,* at *pp.* 292–96; *cf. People v. Piatt,* 56 *Ill. App. 2d* 254, 206 *N. E. 2d* 124 (1965). There is much to be said in favor of compulsory joinder but our own court rules thus far omit provision therefor although they do provide for permissive joinder with power in the trial court to sever when justice so requires. See *R. R.* 3:4–7; *R. R.* 3:4–8; *R. R.* 3:5–6; *R. R.* 3:5–7. It appears evident to us that, as the Government acknowledged in *Petite* and *Marakar,* consolidation is generally the proper course but the defendant here is in no position to complain since he specifically objected to consolidation below. Nor may he, in view of that objection, prevail on any claim of harassment or oppression by virtue of the successive prosecutions. In *State v. Currie,* 41 *N. J.* 531, 539 (1964), we pointed out that, in applying double jeopardy, "the primary considerations should be fairness and fulfillment of reasonable expectations in the light of the constitutional and common law goals." When the trial court sustained the defendant's objection to consolidation it explicitly conveyed to the defendant its view (supported by the many precedents holding the offenses to be separate and distinct) that the conspiracy trial would not in itself bar later prosecution on the substantive charges. In the light of all this, the defendant's plea must be rejected to the

extent that it places strict reliance on the double jeopardy clause of our state constitution (*Art.* I, *par.* 11) or on the double jeopardy clause of the fifth amendment, assuming that clause is to be viewed as applicable to the states under the fourteenth amendment.

■■ Although the defendant may not here prevail on any constitutional claim of double jeopardy, he may still invoke settled procedural principles of *res judicata* or collateral estoppel insofar as they are applicable. See *Sealfon v. United States,* 332 *U. S.* 575, 68 *S. Ct.* 237, 92 *L. Ed.* 180 (1948); *United States v. Kramer, supra,* 289 *F. 2d* 909; *Dapcevich v. State,* 360 *P. 2d* 789 (*Alaska* 1961); *People v. Haran,* 27 *Ill. 2d* 229, 188 *N. E. 2d* 707 (1963); Mayers and Yarbrough, *"Bis Vexari:* New Trials and Successive Prosecutions,"* 74 *Harv. L. Rev.* 1, 29 (1960); Note, "Collateral Estoppel in Criminal Cases," 28 *U. Chi. L. Rev.* 142 (1960). The rule of collateral estoppel, which is part of the broader field of *res judicata,* wisely directs that once a matter has been actually litigated and determined, it cannot be relitigated in a subsequent proceeding between the same parties. While the rule may have a longer history and be more familiar in civil litigation, it is admittedly applicable in criminal litigation as well. See *Laughlin v. United States,* 120 *U. S. App. D. C.* 93, 344 *F. 2d* 187, 189–191 (*D. C. Cir.* 1965); Mayers and Yarbrough, *supra,* 74 *Harv. L. Rev.,* at 29–39; *cf. Teitelbaum Furs, Inc. v. Dominion Ins. Co.,* 58 *Cal. 2d* 601, 25 *Cal. Rptr.* 559, 375 *P. 2d* 439 (1962), *certiorari* denied *Teitelbaum Furs, Inc. v. American Home Ins. Co.,* 372 *U. S.* 966, 83 *S. Ct.* 1091, 10 *L. Ed. 2d* 130 (1963).

In *Sealfon v. United States, supra,* two indictments were returned aganst the defendants Sealfon and Greenberg. The first charged a conspiracy to defraud the United States by falsely representing to a ration board that certain sales and invoices of sugar products were made to exempt agencies. The second charged the substantive offense of uttering the false invoices as true. Greenberg pleaded guilty on both charges and Sealfon was tried on the conspiracy charge and

was found not guilty by the jury. Sealfon was then brought to trial on the substantive charge, the Government relying on the evidence that Sealfon had aided and abetted Greenberg's fraud. In this trial the jury returned a verdict of guilty. Sealfon originally had claimed double jeopardy and *res judicata* but later abandoned any reliance on double jeopardy principles. His claim of *res judicata* was upheld in an opinion by the Supreme Court which pointed out that the crucial question was whether the jury's verdict in the conspiracy trial was a determination favorable to Sealfon "of the facts essential to conviction of the substantive offense" and that this would turn on "the facts adduced at each trial and the instructions under which the jury arrived at its verdict at the first trial." 332 *U. S.,* at *pp.* 578–579, 68 *S. Ct.,* at *p.* 239, 92 *L. Ed.,* at *p.* 184. In *Yates v. United States,* 354 *U. S.* 298, 77 *S. Ct.* 1064, 1 *L. Ed. 2d* 1356 (1957), the Court, citing *Sealfon,* noted that "a party may be precluded under the doctrine of collateral estoppel from attempting a second time to prove a fact that he sought unsuccessfully to prove in a prior action." 354 *U. S.,* at *pp.* 335–336, 77 *S. Ct.,* at *p.* 1085, 1 *L. Ed. 2d,* at *p.* 1385. See *United States v. De Angelo,* 138 *F. 2d* 466 (3 *Cir.* 1943) ; *Cosgrove v. United States,* 224 *F. 2d* 146 (9 *Cir.* 1955).

In *United States v. Kramer, supra,* the defendant was tried and acquitted on substantive charges of having burglarized certain post offices. He was later tried and convicted on several counts which charged a conspiracy to break and enter the post offices and a conspiracy to receive moneys and other things of value from the post offices. On appeal, the Court of Appeals for the Second Circuit rejected the defense of double jeopardy but sustained the defendant's claim of collateral estoppel, directing an acquittal on the counts which charged conspiracy to break and enter and a new trial on the remaining counts. It pointed out that while, in theory, the conspiracy acquittal in *Sealfon* was not inconsistent with a conviction on the substantive charge, the Supreme Court had examined the record, had concluded that "the core of the prose-

cutor's case was in each case the same," and had reversed the defendant's conviction. 332 *U. S.*, at *p.* 580, 68 *S. Ct.*, at *p.* 240, 92 *L. Ed.*, at *p.* 185. Pursuing a similar course, the Court of Appeals found that, while Kramer's acquittal on the substantive burglary charges was not strictly inconsistent with a conviction of conspiracy to burglarize, the record sufficiently disclosed that the Government's case was in each instance the same and it was therefore precluded by the burglary acquittal from later seeking to assert or establish that Kramer had burglarized the post offices. 289 *F. 2d*, at *p.* 919. See *Dapcevich v. State, supra,* 360 *P. 2d,* at *p.* 791.

The readiness of the courts in *Sealfon* and *Kramer* to examine the record to ascertain what matters were actually litigated and determined in the earlier proceeding may be contrasted with the approach in *State v. Hoag,* 21 *N. J.* 496 (1956), aff'd. *sub nom. Hoag v. New Jersey,* 356 *U. S.* 464, 78 *S. Ct.* 829, 2 *L. Ed.* 2d 913 (1958). There four persons were held up in a tavern about three o'clock one afternoon. The defendant was accused of being one of the holdup men and was brought to trial on a charge of having committed robbery on three of the victims. The defendant denied he was one of the robbers and asserted an alibi. He was acquitted but was later tried on the charge that he had robbed the fourth victim. This time he was convicted and his conviction was sustained in this Court and in the United States Supreme Court by sharply divided votes. In *State v. Currie, supra,* 41 *N. J.,* at *p.* 539 we recently noted that the majority opinion in *Hoag* has been "forcefully criticized" in the law reviews where it has also been described as an "imaginative misapplication of collateral estoppel." Mayers and Yarbrough, *supra,* 74 *Harv. L. Rev.,* at *p.* 39. If, as the dissenting justices fairly concluded from their study of the record, the only rational explanation of the acquittal was the jury's finding that the state had not proved that the defendant was one of the robbers, his claim of collateral estoppel should clearly have been upheld to preclude the second effort by the state to prove that he was. See Heher, J., dissenting in *State v. Hoag, su-*

*pra,* 21 *N. J.,* at *pp.* 515–517; Warren, C. J., dissenting in *Hoag v. New Jersey, supra,* 356 *U. S.,* at *pp.* 475–477, 78 *S. Ct.* 829, 2 *L. Ed. 2d,* at *pp.* 922–923.

The defendant Cormier was indicted for a conspiracy in violation of *N. J. S.* 2A:98–1. Unlike common law conspiracy (*State v. Carbone,* 10 *N. J.* 329, 336–338 (1952)), an overt act in furtherance is essential, apart from certain exceptions (*N. J. S.* 2A:98–2), for a conviction on a charge of statutory conspiracy. See *State v. Dixon,* 133 *N. J. L.* 348 (*Sup Ct.* 1945); *State v. Dennis,* 43 *N. J.* 418, 423 (1964). Here, the conspiracy indictment set forth, as overt acts, the $50,000 loan from the Franklin Bank and the $80,520 loan from the First National Bank of Passaic County. The State presented evidence in support of its assertion that Cormier and Butler had fraudulently conspired to obtain the loans from the banks through false and fictitious invoices. Cormier did not dispute that he and Butler had agreed to obtain the loans but his testimony was that the loans were made by the banks on the security of certain purchase orders rather than accounts receivable, and that the purchase orders referred to were *bona fide* and on hand.

Cormier's testimony and his counsel's summation laid stress on the assertion that no financing would have been necessary if the company had current bills, customarily payable in ten or thirty days, on accounts such as General Electric, Horrocks-Ibbotson and Mengel, and that the financing was obviously needed to aid in completing purchase orders which the banks understood were on hand. In his charge, the trial judge explicitly submitted to the jury for its determination, the issue he considered to be the crucial one in the case, namely, whether the loans were made on the basis of false and fictitious invoices as the State contended or on the basis of purchase orders as the defendant contended. Despite the documentary evidence, the jury returned a verdict of not guilty. In the light of the record before us, and particularly the judge's charge which the jury presumably followed, the only rational explanation is that the jury accepted the defendant

Cormier's contention that the loans were made by the banks on the basis of *bona fide* purchase orders actually on hand and that he was therefore not guilty of any fraud.

After the acquittal, the State placed Cormier on trial for having fraudulently obtained the $50,000 loan from the Franklin Bank. The evidence was substantially the same as that introduced during the first trial with respect to the loan from the Franklin Bank. And the contentions were substantially the same, the State asserting that the loan was made on the basis of false and fictitious accounts receivable and the defendant asserting that the loan was made on the basis of *bona fide* purchase orders and that Butler was the one responsible for the forms of the instruments. This time the jury rejected the defendant's contention and returned a verdict of guilty. Viewed realistically, this amounted to an impermissible disavowal of the first jury's determination.

The doctrine of collateral estoppel should not be applied grudgingly. The State's resources are sufficient to enable it to prepare and present its case thoroughly. It did that during the first trial. The fact that it then failed to persuade the jury that the loans were made on the basis of false and fictitious invoices rather than *bona fide* purchase orders was no reason for allowing it to try again. The broadening policy considerations in favor of safeguarding individual rights of defendants and the need for conserving public energies as well as public funds, strongly suggest that where, as here, a jury has considered and rejected the State's contention in favor of the defendant's contention on the issue submitted as the crucial one, the matter should be permitted to rest in its entirety.

Reversed.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.