927 A.2d 569 (2007)
394 N.J. Super. 492
STATE of New Jersey, Plaintiff-Appellant,
v.
Charles BROWN, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 2007.
Decided July 11, 2007.
*570 Laurie A. Corson, Special Deputy Attorney General, Acting Assistant Prosecutor, argued the cause for appellant (Joshua M. Ottenberg, Acting Camden County Prosecutor, attorney; Ms. Corson, of counsel and on the brief).
Mark A. Fury argued the cause for respondent.
Gibbons, attorneys for amicus curiae New Jersey Coalition for Battered Women (Lawrence S. Lustberg, of counsel; Megan Lewis, on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and SABATINO.
The opinion of the court was delivered by
STERN, P.J.A.D.
Following dismissal of an indictment charging defendant Charles Brown ("defendant") with sexual assault, criminal sexual contact and aggravated assault, the State appeals to us, contending that the trial judge improperly dismissed the indictment based on the doctrine of collateral estoppel after a final restraining order ("FRO") in a domestic violence case covering the same incident had been denied. The Family Part dismissed the complaint seeking an FRO under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-1 to -35 ("the Act"), and vacated a previously *571 issued temporary restraining order ("TRO"). The issue, as raised by the State, "is whether a criminal indictment in a domestic violence case may be dismissed pursuant to the doctrine of collateral estoppel due to the [Family Part]'s finding in domestic violence proceedings that the victim had failed to prove an act of domestic violence by a preponderance of the evidence." The State argues that the indictment and prosecution are "not barred by the findings of the family court in a previous domestic violence proceeding." We agree and reverse the dismissal.

I.
On December 22, 2004, M.L. filed a complaint under the Act in the Family Part in Camden County. A TRO and amended TRO were issued based thereon. On February 3 and March 15, 2005, an evidentiary hearing on the FRO was conducted.[1] M.L., a friend of M.L.'s, and defendant testified. The trial judge thereafter rendered an opinion and an order, entered on March 21, 2005, dismissing complaint and vacating the TRO.
The Family Part judge found that defendant and M.L. had a dating relationship that began in April 2003, and "they started a sexual relationship which continued off and on until the day of the date of this incident[.]" The indictment against the defendant arose from a sexual encounter between the defendant and M.L. in the early morning hours of December 22, 2004, the day after M.L. observed defendant in a store with another woman and M.L. discovered she had a sexually transmitted disease which she attributed to defendant. The Family Part's opinion contained the following findings of fact:
3) . . . [M.L. and defendant] spoke to each other a number of times on the night of December 21, 2004. First [M.L.] called [defendant] at home when he was getting ready to go out with his brothers to celebrate his one brother's birthday. During that call, [defendant] received a phone call from someone else and told her he would have to call her back. [M.L.] then called him back when he was still at home getting ready shortly after that. In that conversation they agreed that they would see each other later that night at [M.L.]'s home.
4) While in the bar, called "Off Broadway", [defendant's] phone rang and it was [M.L.] asking him if he was still coming over later that evening and he said yes. He then went from the Off-Broadway Bar to the 20 Horse Tavern and left the 20 Horse Tavern at around 1:00 a.m. on December 22nd with the intention to go to [M.L.]'s home.
5) In their earlier conversation in the evening, [defendant] had asked her if she was going to leave the door unlocked or if he should knock and she said she would be able to hear him so he should knock.
6) When he got to the apartment at 1:00 o'clock she immediately opened the door upon his soft knock (he didn't want to wake up her daughter, if her daughter was home). When he entered the apartment he asked her "Where's Light bulb", Light bulb being [M.L.]'s daughter.
7) They began to kiss and hug in the doorway, after the door was closed and immediately after that [M.L.] walked away, went over and closed her daughter's bedroom door, which was her custom in the past when her daughter was *572 at home, asleep and the parties decided to engage in sexual relations.
8) [M.L.]'s testimony at first was that she told him that she wasn't interested in having sex because she had her period. However, her testimony was also that in the past that hadn't stopped them from having sex and also that they had quite some time ago started to engage in anal sex. This is consistent with his testimony in that he replied when she said she was having her period, that there "were other ways".
9) Much of her upset seemed to be with the existence of what she called "Passion marks" on her neck. These were significant bruise marks that she testified he had also done in the past but that she had been able to cover them with band aids and go to school. She testified that at one point she didn't want him to give her the passion mark on her neck; that "if he was going to do it, I wanted him to do it down lower", indicating with her hand the area below her collarbone. She also said she had no band aids that day to cover the marks before going to school. She was embarrassed by the marks, saying they were unprofessional.
10) She testified that in the past, things had gotten rough in their sex life. This is consistent with the way that this sexual encounter occurred as well. She testified that [he] punched her in the face while she was engaging in oral sex with him, however, this would be inconsistent with the lack of injury to him in that if he had been punching her while this was going on, he, in all likelihood, would have suffered injury to his penis.
11) She was unable to identify what was supposed to be a handprint on her back, admitting that it did not look like a handprint at all and that the picture itself was taken some 12 hours after the alleged incident. The other photographs showed the "passion marks". As to the bite on the hand, the Court finds it would have been physically impossible for Mr. Brown to bite the hand in the manner described by [M.L.] without breaking her arm in the process.
12) [M.L.] said that all of this took place between 1:00 o'clock and 2:00 o'clock in the morning. Her daughter who was right in the next room, slept through the entire thing with the door closed.
13) She testified that after the sexual encounter was over, she got a warm washcloth for the defendant and helped him to clean himself off. She also hugged him. They engaged in a conversation wherein she told him that he smelled nice.
14) Despite the fact that she had her girlfriend [J]'s phone number ([J] considers them to be good friends, having attended school together and seeing each other almost every day for the past 18 months), she failed to call [J] at 2:00 a.m. to tell her anything of the incident, failed to call the police and in fact testified that she went to bed and slept until 6:00 to 6:30 at which time she got up to get herself and her daughter ready for school.
15) Her friend, [J], who also testified, came to pick [M.L.] up at 8:00 o'clock in the morning on December 22, 2004, dropped [M.L.]'s daughter at school, and then commented about the marks on [M.L.]'s neck. At that point, she told [J] the entire story, but yet proceeded to go to school and stay at school from 8:30 until 12:30 that day. The Court questioned her extensively about her days off. She is permitted 10 days off from school in the 18 month period that the course of study takes place. She started in September of 2003 and anticipates finishing the courses the end of March, 2005, at which time she will graduate.

*573 16) At the time of this incident, which was December 22nd, 2004, with only 3 months of school to go, she still had 4.1 days which she could have taken off and yet chose not to take the day off to go to the police to report this incident which she was allegedly so traumatized by. In fact, it is even more bizarre that she didn't take the day off, when in testimony it was developed that only 2 hours of a 4 hour day was devoted to class time and the other two hours were devoted to a freshman birthday party that didn't involve any class work or learning at all. She testified that she knew about the freshman party before that day so in fact had she wanted to truly not miss much class time, this would have been the perfect day to take off from school, because she only had two hours of actual class time anyway. She testified that prior days off were taken by her for snow days and others were for lateness that had accrued. (Apparently for every 3 days late, she is docked one day off.)
The Family Part judge then rendered the following conclusion:
It appears from the testimony of both of the parties that this sexual encounter was consensual. Plaintiff having invited the Defendant in; having closed the door to her daughter's bedroom in anticipation of engaging in sexual relations with the defendant and the past history of the parties' sexual relationship, conduct and mannerisms. She testified that she didn't say no, didn't yell or scream, didn't push him away and didn't struggle or make excuses to avoid the situation.
In essence, the judge found that the proofs revealed a consensual relationship, and therefore no basis for the finding of a violation of the Act existed. In any event, the Family Part concluded that plaintiff "failed to prove by a preponderance of the evidence that the defendant committed the acts of domestic violence against her." Accordingly, the judge dismissed the complaint.

II.
The Law Division dismissed the indictment against defendant on April 24, 2006 based on the Family Part's adjudication. In his formal opinion, the Law Division judge referred to facts that were not presented in any evidentiary hearing but were acknowledged by the prosecutor for purposes of the motion. At argument before us, the parties did not dispute or disagree with those facts, and we will accept them for purposes of this opinion:
The defendant and ML, the alleged victim in this case, had a dating relationship which began in 2003. The events at the heart of this case began with a sexual encounter between the defendant and ML that occurred between 1 A.M. and 2 A.M. on December 22, 2004. Some twelve hours later, at about 2 P.M., ML reported what had occurred between her and the defendant to the Camden City Police Department.
The Camden City Police Department took ML's complaint and immediately notified the Camden County Prosecutor's Office about the allegations that ML had made. Two investigators from the Prosecutor's Office were dispatched to the Camden City Police Department where they met ML and took her to Cooper Medical Center to be examined. After the examination, ML provided the investigators with a statement.
At about 10:30 P.M. that same day, Investigator Mark English from the Prosecutor's Office, who was attached at the time to the Domestic Violence Task Force, helped ML to obtain a [TRO] against the defendant. Investigator English placed a phone call to Judge *574 McFeeley, the designated on-call judge. Judge McFeeley then spoke with the victim, took her statement under oath, and granted her request for a TRO. He then spoke with Investigator English and instructed him as to how to complete the TRO application form. Investigator English then completed the written TRO application form as instructed by Judge McFeeley.
On December 30, 2004, a complaint signed by Investigator Fitzwater from the Special Prosecutions Unit of the Prosecutor's Office was issued against the defendant based on the events that occurred in the early morning hours of December 22, 2004. Investigator Fitzwater was one of the two investigators who accompanied ML to Cooper Medical Center.
A hearing based on ML's complaint was conducted . . . in Superior Court, Chancery DivisionFamily Part, on February 3, 2005, and March 15, 2005. The purpose of the hearing was to determine whether the ex parte Temporary Restraining Order that had been issued by Judge McFeeley would be converted into a Final Restraining Order. At the hearing, testimony was taken from ML, a friend of ML's, and the defendant.
Over the course of the two day Family Court hearing, a representative from the Victim-Witness Unit at the Prosecutor's Office was in constant attendance to provide support and assistance to ML. In addition, Investigator Fitzwater attended one day of the hearing.
ML was represented at the Family Court hearing by Denise Higgins from the Center for Law and Social Justice, a privately funded, non-profit, public interest law firm. ML was directed to Attorney Higgins by the Prosecutor's Office.
During the course of the Family Court hearing Attorney Higgins introduced into evidence various photographs of ML that had been taken by the Prosecutor's Office. These photographs had been provided to Attorney Higgins by the Prosecutor's Office; the photographs were not made available to the defendant.
The judge thereafter concluded that "the Prosecutor's Office and [M.L.] were in privity in connection with [M.L.]'s domestic violence complaint[,]" and, as a result of the findings at the evidentiary hearing by the Family Part, the doctrine of collateral estoppel precluded re-litigation of the elements of the offense embodied in the indictment. According to the judge:
"The concept of privity, as well as its parameters, are necessarily imprecise: `Privity states no reason for including or excluding one from the estoppel of a judgment. It is merely a word to say that the relationship between the one who is a party on the record and another is close enough to include the other within the res judicata.'" Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 338, 676 A.2d 1065 (1996) (quoting Bruszewski v. U.S., 181 F.2d 419, 424 (3rd Cir.1950)). "A relationship is usually considered `close enough' only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation." Collins v. E.I. DuPont de Nemours & Co., 34 F.3d 172, 176 (3rd Cir.1994) (applying New Jersey law); see also Moore v. Hafeeza, 212 N.J.Super. 399, 403-04, 515 A.2d 271 (Ch.Div.1986) (stating that "[g]enerally, one [person] is [in] privity with another and is bound by and entitled to the benefits of a judgment as though he was a party when there is such an identification of interest between *575 the two as to represent the same legal right. . . . ").
Here, the Prosecutor's Office was involved with ML from almost the first moment she filed her complaint with the Camden City Police Department. Two investigators from the Prosecutor's Office met ML at the Camden City Police Department, accompanied her to Cooper Hospital where she was examined, and took a statement from her. Later the Prosecutor's Office photographed ML's alleged injuries and an investigator helped ML to secure a Temporary Restraining Order against the defendant. The Prosecutor's Office directed ML to a specific attorney at the Center for Law and Social Justice and provided ML's attorney with the photographs it had taken of her for use during the Family Court proceeding; they did not reciprocally provide the photographs to the defendant. At the Family Court hearing, the Victim-Witness Unit from the Prosecutor's Office provided ML with support and assistance from the beginning of the hearing until its conclusion, and the Prosecutor's investigator who signed the complaint against the defendant attended the hearing for one day. From all of this it is clear that the Prosecutor's Office and ML were in privity in connection with ML's domestic violence complaint because "there was such an identification of interest between the two as to represent the same legal right. . . ." Ibid.

. . . .
Because the defendant has proven each of the five elements necessary for the doctrine of collateral estoppel to apply in this case based on the prior Family Court domestic violence adjudication, the State is foreclosed from raising any of the issues that were decided by the Family Court in its decision of March 22, 2005. Because the issues that were raised and decided by the Family Court are essential to [the] State's criminal prosecution of the defendant, and because the State is foreclosed by the doctrine of collateral estoppel from using these essential facts already decided by the Family Court, it is the ORDER of this Court that Indictment No. 2678-06-05 against the defendant be DISMISSED.

III.
The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb. . . ." The clause is applicable to the States, see, e.g., Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707, 716 (1969), and our more narrowly drafted State Constitutional provision has been held to be "co-extensive with the federal clause[,]" or to provide the minimum protection of the Fifth Amendment.[2]State v. Churchdale Leasing, Inc., 115 N.J. 83, 107, 557 A.2d 277 (1989); see also, e.g., State v. DeLuca, 108 N.J. 98, 101-02, 527 A.2d 1355 (1987); State v. Rechtschaffer, 70 N.J. 395, 404, 360 A.2d 362 (1976).
In Ashe v. Swenson, the United States Supreme Court held that the rule of collateral estoppel is embodied within the Double Jeopardy Clause, "[protecting] a man who has been acquitted from having to `run the gauntlet' a second time." 397 U.S. 436, 445-46, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469, 476-77 (1970). Collateral estoppel "means simply that when an issue *576 of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443, 90 S.Ct. at 1194, 25 L.Ed.2d at 475. In Ashe, the Court determined that a defendant could not be prosecuted for robbery of one of six victims at a poker game after he had been acquitted of robbing another of the six and identification was a critical issue. Id. at 446-47, 90 S.Ct. at 1195-96, 25 L.Ed.2d at 477.
Before us, the State contends that the doctrine of collateral estoppel should not be applied in this case because there was no privity between the victim in the domestic violence action and the State. As the Law Division judge properly noted, in order for collateral estoppel to foreclose re-litigation of an issue, the party asserting the bar must show that five elements exist:
(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

[First Union Nat'l Bank v. Penn Salem Marina, 190 N.J. 342, 352, 921 A.2d 417 (2007) (quoting Hennessey v. Winslow Township, 183 N.J. 593, 599, 875 A.2d 240 (2005)) (emphasis added).]
Although, in the civil context, the doctrine of collateral estoppel is one of equity, Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521, 897 A.2d 1003 (2006), and "may be denied on equitable grounds even when the five elements . . . are satisfied," Perez v. Rent-A-Center, Inc., 186 N.J. 188, 199, 892 A.2d 1255 (2006), that is not so in the Fifth Amendment context. Civil and criminal proceedings involve different values. See State v. Gonzalez, 75 N.J. 181, 194, 380 A.2d 1128 (1977); id. at 197-98, 380 A.2d 1128 (Conford, J. concurring).
The State challenges only the Law Division's holding that the fifth element of collateral estoppel, privity between the parties, was satisfied in this case. The State does not challenge the court's finding that the first four elements were met. In his ruling on defendant's motion to dismiss the indictment, the Law Division judge noted that:
there was no essential disagreement between the parties that the Family Court hearing addressed the identical issues that must be proven by the State beyond a reasonable doubt at the defendant's criminal trial. There was also no disagreement that the Family Court proceeding afforded both parties who attended the hearing a full and fair opportunity to litigate the facts through exactly the same witnesses who would be heard at trial. It is uncontroverted that the factual determinations made by the Family Court were essential to its decision, which is found by this Court to have been a final judgment.
[(Footnotes omitted).]
Thus, we must determine whether the State was in privity with M.L. in her domestic violence action.
Our Supreme Court has stated that:
The concept of privity, as well as its parameters, are necessarily imprecise: "Privity states no reason for including or excluding one from the estoppel of a judgment. It is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include the other within the res judicata."

*577 [Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 338, 676 A.2d 1065 (1996) (quoting Bruszewski v. United States, 181 F.2d 419, 423 (3d Cir.1950) (Goodrich, J., concurring)).]
"`A relationship is usually considered "close enough" only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation.'" Ibid. (quoting Collins v. E.I. Dupont de Nemours & Co., 34 F.3d 172, 176 (3d Cir.1994)).
The doctrine of collateral estoppel usually precludes prosecution for an offense only after a defendant has been previously placed in jeopardy for another offense based on the same issue. See Ashe, supra, 397 U.S. at 444-46, 90 S.Ct. at 1194-95, 25 L.Ed.2d at 475-77; State v. Redinger, 64 N.J. 41, 312 A.2d 129 (1973) (double jeopardy nor collateral estoppel prevent prosecution for perjury and obstruction of justice after prior trial); State v. Ebron, 61 N.J. 207, 214-18, 294 A.2d 1 (1972). See also Standefer v. United States, 447 U.S. 10, 11-14, 21-25, 100 S.Ct. 1999, 2002, 2006-09, 64 L.Ed.2d 689, 693-94, 698-701 (1980) (United States Supreme Court unanimously held that a defendant could be prosecuted for aiding and abetting a felony by an Internal Revenue Service agent who had been previously acquitted of the underlying offense). But see also, e.g., State v. Gonzalez, supra, 75 N.J. at 194-97, 380 A.2d 1128 (applying doctrine with respect to prior decision on co-defendant's motion to suppress where defendant was not present for the motion). As Justice Pashman noted in Gonzalez,
[c]ollateral estoppel has been used in criminal prosecutions to complement the constitutional protection against double jeopardy by protecting defendants against multiple prosecutions for different "offenses" based on the same set of facts. See, e.g., Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948); United States v. Oppenheimer, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916); State v. Bell, 55 N.J. 239, 260 A.2d 849 (1970); State v. Cormier, 46 N.J. 494, 218 A.2d 138 (1966). Thus the hallmark of this doctrine has been the identity of parties. The leading United States Supreme Court case, Ashe v. Swenson, supra, defined collateral estoppel to be "the principle that bars relitigation between the same parties of issues actually determined at a previous trial." 397 U.S. at 442, 90 S.Ct. at 1193, 25 L.Ed.2d at 474.
[Gonzalez, supra, 75 N.J. at 192, 380 A.2d 1128.]
The Gonzalez Court further noted that "reasons militating against abandonment of the identity of parties rule in criminal cases bear on the practicalities of litigation." Id. at 194, 380 A.2d 1128. See also Gonzalez, supra, 75 N.J. at 197-99, 380 A.2d 1128 (Conford, J. concurring). But in that case, the prosecutor was the same and the decision on the motion to suppress was against the State.
As the Prevention of Domestic Violence Act demonstrates, the purpose of an action in the Family Part, designed to protect an individual victim, is quite different than a criminal case in which the State prosecutes a defendant on behalf of the public interest. The Act was enacted "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. The Legislature found that "it is the responsibility of the courts to protect victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions[.]" Ibid. The Act further states that "[a] victim shall not be prohibited *578 from applying for, and a court shall not be prohibited from issuing, temporary restraints pursuant to this act because the victim has charged any person with commission of a criminal act." N.J.S.A. 2C:25-26(f).
Several portions of the Act emphasize that a complaint brought under its provisions and a criminal proceeding brought for the same underlying conduct are separate and distinct matters. The Act provides:
If a criminal complaint arising out of the same incident which is the subject matter of a complaint brought under [the Prevention of Domestic Violence Act] has been filed, testimony given by the plaintiff or defendant in the domestic violence matter shall not be used in the simultaneous or subsequent criminal proceeding against the defendant, other than domestic violence contempt matters and where it would otherwise be admissible hearsay under the rules of evidence that govern where a party is unavailable.
[N.J.S.A. 2C:25-29(a) (emphasis added).]
The legislative history demonstrates that the Act "anticipates and provides for simultaneous or subsequent criminal proceedings" unimpacted by the other, except for a contempt proceeding. Cannell, New Jersey Criminal Code Annotated (Gann 2007), comment on N.J.S.A. 2C:25-29 (2007); N.J.S.A. 2C:25-29. The Act further declares that a domestic violence victim must be informed of "the right to file a criminal complaint against [his/her] attacker[,]" N.J.S.A. 2C:25-23, and another portion of the Act explicitly states that "[f]iling a complaint [in the Family Part alleging an act of domestic violence] shall not prevent the filing of a criminal complaint for the same act." N.J.S.A. 2C:25-28(a).
Application of the collateral estoppel doctrine would be inconsistent with the State policy underlying the handling of DV cases and is not warranted as a matter of constitutional law. Accordingly, we decline to bar this criminal prosecution on the basis of a collateral estoppel.[3] In so holding, we act in concert with the precedents of all other jurisdictions known to us that have addressed the issue. See State v. Manista, 651 A.2d 781, 782-86 (Del. Fam.Ct.1994) (rejecting a collateral estoppel argument and noting "legislative intent of providing the petitioner with both a civil and criminal remedy[,]" id. at 785.); People v. Wouk, 317 Ill.App.3d 33, 250 Ill.Dec. 603, 739 N.E.2d 64 (2000) (refusing to apply collateral estoppel doctrine to preclude prosecution and noting that "[t]he differences of purpose and goal in the civil and criminal procedures are `very real[,]'" id. at 70.); State v. Hughes, 863 A.2d 266 (Me.2004) (noting that shared interest between State and petitioner in establishing that defendant assaulted petitioner was not enough to apply doctrine of collateral estoppel as defendant did "not demonstrate that the State had the right to participate in the prior proceeding, to control the proceedings, to adduce testimony, to cross-examine any of the witnesses, or appeal from judgment of court[,]" id. at 269.); State v. Ohm, 107 Ohio Misc.2d 19, 736 N.E.2d 121, 124 (2000) (stating that to allow findings in domestic violence actions to determine outcome in criminal proceedings would force domestic violence victims to choose between obtaining a civil protection order or pursuing criminal charges, *579 thereby frustrating purpose of civil protection); see also City of Cleveland v. Hogan, 92 Ohio Misc.2d 34, 699 N.E.2d 1020, 1025 (1998) (noting that the city's interest "in enforcing the law is different from the interest of the complainant in protecting herself from further abuse[,]" ibid.).

IV.
In finding privity and dismissing the indictment, the Law Division in this case relied on the involvement of the Prosecutor's Office in investigating M.L.'s claim. As already noted, two investigators from the Prosecutor's Office accompanied M.L. to the hospital and took a statement from her; the Prosecutor's Office photographed M.L.'s injuries and an investigator helped M.L. to secure a TRO against defendant; the Prosecutor's Office directed M.L. to an attorney at the Center for Law and Social Justice[4] and provided that attorney with the photographs taken by the investigators, and an investigator from the Prosecutor's Office attended the domestic violence hearing. At argument before us, defendant argued that these facts warrant dismissal as a matter of fundamental fairness if not collateral estoppel.
Here, the prosecutor did not directly participate in the domestic violence hearing, did not represent M.L. at the hearing, did not decide who would testify or what evidence to present, and did not cross-examine witnesses at the hearing. The interests of M.L., not the State, were presented at the domestic violence hearing, and the proceedings related to issuance of an order for protection. To preclude a criminal prosecution merely because a prosecutor's office has assisted a victim in a domestic violence proceeding might result in victims not pursuing restraining orders for their protection or victims' assistance units of prosecutor's offices declining to assist them. Such actions would run contrary to the public policy of the State of New Jersey as embodied in the Act. Cf. State v. Silva, 394 N.J.Super. 270, 926 A.2d 382 (App.Div. 2007) ("specific findings of the domestic violence judge . . . are not a proper subject for judicial notice," id. at 278, 926 A.2d 382).
Given the legislative policy embodied in the Act and the Victims' Rights Amendment to our Constitution, N.J. Const., art. I, ¶ 22, the doctrine of fundamental fairness cannot preclude the State from prosecuting a defendant indicted for a charge that formed the basis of an unsuccessful domestic violence complaint.

V.
The order under review is reversed, and the matter is remanded to the Law Division for prosecution of the indictment.
NOTES
[1] Four "continuance orders" were entered in the Family Part carrying the matter and continuing the TRO "in full force and effect" in the interim.
[2] N.J. Const. art. 1, ¶ 11 provides only that "[n]o person shall, after acquittal, be tried for the same offense." Here, jeopardy has not attached on any "offense," and defendant has not been "acquitted."
[3] Even though the prosecutor represents a different interest than an individual party, the prosecutor has an obligation to see that "justice shall be done" and should consider the Family Part's decision in determining whether to prosecute a case. See Lloyd v. Am. Exp. Lines, Inc., 580 F.2d 1179, 1191 (3d Cir.1978) (Stern, J., concurring).
[4] She was incorrectly referred to as an Assistant Prosecutor on the cover of the transcripts of the proceedings in the Family Part.