# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0131-19

P.R.S.,

    Plaintiff-Respondent,

v.

R.S.,

    Defendant-Appellant.

_____

> Argued June 3, 2021 – Decided August 10, 2021
>
> Before Judges Accurso and Enright.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FV-09-1847-19.
>
> Thomas Sidoti argued the cause for appellant.
>
> Adam C. Brown argued the cause for respondent (Freeman Law Center LLC, attorneys; Adam C. Brown, on the brief).

PER CURIAM

Defendant R.S.[1] appeals from a May 21, 2019 final restraining order (FRO) entered in favor of plaintiff P.R.S. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. He also challenges the August 21, 2019 denial of his motion to reconsider the entry of the FRO. We affirm.

The parties were married in 2006 and have a son who was born in 2015. Plaintiff testified that on the morning of March 22, 2019, she arranged for the parties' nanny to watch their son so plaintiff could meet with a domestic violence victim's advocate at the courthouse. While she was out of the parties' apartment, defendant called and spoke to the parties' nanny. Around 1:40 p.m. that afternoon, plaintiff returned home, relieved the nanny, and was eating lunch when she saw defendant walk in the door.

According to plaintiff's testimony, defendant was angry and loudly asked her why she had the nanny in their home without informing him. Plaintiff asked defendant to discuss the issue later because their son was present in the apartment at the time. She testified that he "continued to yell" and when she asked him to "reduce [his] volume," he "hit [her] very hard on [her] face" causing her eardrum to "start[] ringing." She grabbed her phone and told defendant she was calling

_____

[1] As required by Rule 1:38-3(d)(10), we use initials to protect the privacy of the parties and the confidentiality of these proceedings.

A-0131-19

9-1-1. Unbeknownst to defendant, plaintiff recorded defendant slapping her, so the judge permitted the audio recording of the incident to be played during her testimony.

Plaintiff also testified that when she told defendant she was calling 9-1-1, he grabbed her phone from her and retreated to a bedroom. She asked for her phone back and defendant refused. Plaintiff stated she tried to physically retrieve her phone from defendant, but he fended off her attempts and then removed the battery from her phone.

Plaintiff called out for help, but no one responded. She also took a picture of her left cheek with her son's Kindle tablet. After spotting defendant's phone on the dining room table, she picked it up, retrieved her son and went down to the concierge in her building to call 9-1-1. When the police arrived, she told them what happened and defendant was arrested. Several days later, plaintiff secured a temporary restraining order (TRO) against defendant, alleging he committed the predicate acts of assault, N.J.S.A. 2C:12-1(a)(1) and harassment, N.J.S.A. 2C:33-4. Plaintiff testified that before she obtained the TRO, the police

3

charged defendant with simple assault, so he was not allowed to return to the parties' apartment or have any contact with her.[2]

In addition to recounting the March 22 incident, plaintiff testified she endured "verbal, emotional and physical abuse" throughout the marriage. She described incidents when defendant purportedly slapped her or threatened to do so. She also testified he called her "an infertile bitch" before their son was born and made other comments that upset her. She stated defendant's "temper has escalated over the years" to the point where she was "constantly in . . . fear of being thrown out of the house . . . of being hurt," and she testified she feared for her life.

Defendant recalled the March 22 incident somewhat differently than plaintiff, but admitted the parties physically fought that day. He stated that after he spoke with the parties' nanny on the morning of the incident, he went home around two o'clock that afternoon and asked plaintiff why she gave the child candy, cookies and ice cream. He testified she ignored him, so he repeated his question and plaintiff again ignored him before retreating to the kitchen. According to defendant, as he followed plaintiff into the kitchen, he reiterated

---

[2] No copy of a criminal complaint lodged against defendant was submitted by either party.

A-0131-19

his concerns about their son. He stated she told him to "shut [his] mouth up" and stepped toward him waving her finger inches from his face. He testified, "So I take my hand and I go to move her hand, and it hits her face." He added, "But it was like trying to move her hand, it wasn't like a slap or a hit." Defendant also testified plaintiff told him she was calling 9-1-1 and when she picked up her phone, he could "see on her hand she's like putting 9-1-1," so he took "the phone from her hand."

Additionally, defendant testified plaintiff jumped on him, hit him, pulled his shirt and scratched him as he held onto her phone. He tried to "escape her grasp." Defendant stated that after plaintiff yelled for help, his son came into the room and the parties stopped physically fighting. Defendant asked plaintiff not to call the police and then "took the phone battery out." He explained he removed the battery from plaintiff's phone because he "didn't want her jumping on [him] again for the phone." According to defendant, plaintiff then walked past him and into the bathroom to check her cheek in the mirror, took a picture of her cheek with their son's "Fire tablet," grabbed his phone and left the apartment with their son.

On cross-examination, defendant denied plaintiff's allegations of prior domestic abuse, but admitted telling his wife once that she should "leave the

house." He testified, "I have not hit her. I don't slap people. I don't slap anyone. So, slapping my wife is out of the question." Defendant also admitted to the court that he did not want a divorce, a sentiment repeated by defendant's attorney during his closing argument.

At the conclusion of the hearing, the trial court stated "credibility is always an issue that needs to be determined. And the truth is, I have problems with the credibility of both of you." The judge explained that he had "a problem" with defendant's testimony that he "went to knock [plaintiff's] finger away" from his face and in doing so, slapped plaintiff. The judge rhetorically asked, "How do you do that? How do you do that? You're telling me that you're trying to hit her finger and you hit her face . . . . So, I have a problem with that right there." The judge also stated, "I have a problem with you taking the phone. It's not your business to be taking the phone. You can't do it. Taking the battery out."

The judge also questioned portions of plaintiff's testimony, highlighting her statement on cross-examination that she could not recall ripping buttons from defendant's shirt in her attempt to get her phone back. The judge further pointed to her testimony about being unable to remember scratching defendant's hand and drawing blood during the altercation. The judge stated, "I would think those are things you would recall. You could say I did it in self defense . . . . Telling

6 A-0131-19

me you don't recall cuts away from the credibility that plaintiff has." The judge

also determined both parties "had agendas" and concluded:

> But I do find based upon the testimony of the defendant that he committed an act of assault, or at least harassment and offensive touching. Even if it was a mistake, it was wrong. It shouldn't have happened. So, I find the predicate act of assault and the lesser included harassment for the offensive touching . . . .
>
> Did plaintiff join in this reckless act? Yes. There clearly was a fight here.
>
> And clearly, the defendant also received maybe even more injuries, although not much. He got a cut on his hand and he got his buttons ripped off his shirt.
>
> . . . .
>
> Now, we hear the audio and it doesn't fit in with the defendant's statement where you're telling her please be quiet, or she's telling you to shut up . . . and you're extremely agitated in that audio.

The judge also referenced plaintiff's allegations about defendant's prior

acts of domestic violence, and found that while some of defendant's comments

toward plaintiff were "terrible," they did not constitute domestic violence, and "a

lot of what has been testified to regarding prior history . . . is domestic

contretemps." Nevertheless, the judge stated that what concerned him more were

"allegations of slapping in the past." While unsure if plaintiff's allegations of

defendant slapping her before the March 22 incident were "true or not true," the

A-0131-19

judge concluded, "I do know on March 22nd, he hit her in the face, he slapped her in the face. So, I find . . . by a preponderance of the evidence the predicate act."

The judge next addressed "the need for the restraining order." He observed plaintiff waited six days before filing for a TRO and that "it looks like she put a whipping on him," so he was unsure "if she has any fear of" defendant. However, the judge quickly added, "[w]hat does concern me is the . . . defendant testifying that he doesn't want a divorce. That concerns me. . . [b]ecause it's the people who can't let go [who] are the problems." Although he did not find plaintiff was a "battered woman," he stated, "But I have a situation here where [plaintiff] was struck in the face."

After taking a short break, the judge returned to the bench and continued his findings, stating:

> The second prong of the FRO analysis is [in] . . . Silver versus Silver,[3] the need for the restraining order. And while . . . again, the credibility of both parties [was] questionable, I do have without a doubt the predicate act. And I have the defendant's word that he doesn't want a divorce, and that makes me think that maybe he hasn't let go. So even though it's a close case, I'm going to order the final restraining order in this matter.

---

[3] 387 N.J. Super. 112 (2006).

The record also reflects the judge continued to have concerns about defendant's future interactions with plaintiff, as evidenced by the following remarks he directed at defendant:

> And you have to learn at some point to let [plaintiff] go, whether you love her or whatever it is. I know you have a child together . . . . But you have to let her go . . . . But right now, because I have a doubt about where you stand with all this, I can't allow accidents to happen, I can't allow situations to occur that may escalate. And that's why I'm ordering [restraints]. . . .
>
> I'm ordering you to have no contact with her of any kind. Now you have a child together . . . .
>
> The only thing I want to address is . . . if there's any issues regarding the child while the father has the child, how shall we contact mom? Can we text her[?]

Plaintiff's counsel promptly represented that plaintiff was agreeable to email communications, so the judge permitted this form of contact. However, he again instructed defendant as follows:

> This is the only communication, is about the child. It can't be about anything else. It can't be about the divorce proceedings, it can't be about getting back together, it can't be about whatever else. Okay?
>
> If you don't like what's happening in terms of the parenting care of the child, which I know is a legitimate issue here, it has to be addressed to the court. Because those are things that are going to potentially escalate and get you in trouble. And I'm trying to avoid that. All I'm trying to do now is de-escalate the situation . . . .

9

> I want things to calm down where you . . . continue to
> be the father that you want to be and that you are.

Additionally, the judge noted defendant "has a right to be the father . . . . And [plaintiff had] the right to go on with [her] life without being bothered." The judge also stated defendant needed to

> take a step back and try to think about what happened
> here . . . . And that should hopefully sober you up in
> terms of your emotions to move forward from here. . . .
>
>    . . . .
>
> You're going to have to accept the reality of the
> situation.

Defendant moved for reconsideration of the entry of the FRO. During oral argument on August 20, 2019, defendant's attorney argued, in part, that the judge mistakenly entered the FRO because he "placed a little too much weight on [defendant] not wanting a divorce." Counsel further argued plaintiff did not have any "legitimate fear" of defendant and that she used the FRO "as a sword in this case to gain advantage in the . . . divorce proceedings." At the conclusion of argument, the judge denied defendant's reconsideration motion in an oral opinion, finding:

> I had a problem with this case, deciding this case on May
> 21st. I think I put on the record that it was a close case
> because one of the problems is the unreliability of both

parties. I didn't feel that there was a fear factor involved. You know, the problem I had and have now with the defendant's motion and version of events, for example, I mean when he testified, "she made my hand hit her face," I mean I can't accept that. That's like saying how many times can I run my face into your fist. It's on that level of ridiculousness that I couldn't accept his testimony. The same thing, he took the phone away at one point . . . . And he admitted doing that. Just, she wants to get the phone back, he won't allow it. I mean, these are the predicate acts that I . . . dealt with and I found based on his own testimony. I did place a lot of emphasis on his testimony about the divorce. Because to me it concerned the court that he has not moved on, despite the certifications and what he says now, that he hadn't moved on. And while she may not have been in fear, at least in my mind, there is still a need to prevent further abuse from somebody who hasn't let go. <u>And that's what I found back then on May 21st.</u> At this point, despite the arguments made, . . . I'm not going to change my opinion . . . .

<u>If she's really here for protection, which is what I believed, then she's got that protection in the restraining order</u>. What will happen in the divorce will play itself out . . . . And yes, there's consequences, sir, of a final restraining order. That's part of having a final restraining order. The predicate acts are done . . . . So, I'm denying . . . the motion for reconsideration.

[(Emphasis added).]

On August 21, 2019, the judge entered an order formally denying defendant's reconsideration motion.

A-0131-19

On appeal, defendant argues the trial court erred by entering an FRO without finding it was necessary to protect plaintiff from future acts of domestic violence and without weighing the factors set forth in N.J.S.A. 2C:25-29. Additionally, he contends the trial court failed to provide sufficient findings of fact and conclusions of law to support its decision. We disagree.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to the Family Part's findings of fact because of its special expertise in family matters. Id. at 413. Deference is especially appropriate in bench trials when the evidence is "largely testimonial and involves questions of credibility." Id. at 412. A trial judge who observes witnesses and listens to their testimony is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions and review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

A-0131-19

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes," Cesare, 154 N.J. at 400.

To determine whether the entry of an FRO is appropriate, the court must first "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Silver, 387 N.J. Super. at 125. If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127; see also J.D., 207 N.J. at 475-76.

A-0131-19

Here, the evidence produced at the final hearing, including the audio recording and the parties' testimony, amply supported the trial judge's finding that plaintiff established defendant committed the predicate acts of assault and harassment by a preponderance of evidence. Although defendant attempted to downplay his role in the incident by testifying, "So I take my hand and I go to move her hand, and it hits her face," plaintiff testified defendant slapped her hard enough to cause her eardrum to "ring." Thus, we perceive no basis to second-guess the judge's finding that defendant committed "the predicate act of assault,"[4] which he deemed to be a "reckless act," and "the lesser included [predicate act of] harassment for the offensive touching,"[5] notwithstanding the judge's professed concerns about each party's credibility.

---

[4] "A person is guilty of assault if he: (1) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another[.]" N.J.S.A. 2C:12-1(a)(1). N.J.S.A. 2C:11-1(a) defines: "bodily injury" as "physical pain, illness or any impairment of physical condition[.]"

[5] N.J.S.A. 2C:33-4 provides, in part, that a person commits a petty disorderly persons offense if, with purpose to harass another, he [or she]:

. . . .

(b) Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

Lastly, we are not persuaded by defendant's argument that the trial judge erred by entering an FRO without finding it was necessary to protect plaintiff from future acts of domestic violence and without weighing the factors set forth in N.J.S.A. 2C:25-29,[6] as required by the second Silver prong. See Silver, 387 N.J. Super. at 127. As this court recently reaffirmed, "[w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" A.M.C.

> (c) Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4.]

[6] Pursuant to Silver, a trial court is to consider, but is not limited to the following factors:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
> (2) The existence of immediate danger to person or property;
> (3) The financial circumstances of the plaintiff and defendant;
> (4) The best interests of the victim and any child;
> (5) In determining custody and parenting time the protection of the victim's safety; and
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29.]

15

v. P.B. 447 N.J. Super. 402, 417 (App. Div. 2016), (quoting Silver, 387 N.J. Super. at 127). Here, defendant's conduct in slapping his wife's face was unmistakably violent, so we are satisfied that although the trial court did not refer to each of the statutory factors set forth in N.J.S.A. 2C:25-29 when entering the FRO, and it would have been better practice to do so, the record supports the issuance of the order.

Moreover, when reading the record as a whole, it is evident the judge did consider the need to prevent further abuse toward the plaintiff, and that he touched on many of the applicable statutory factors referenced in Silver. For example, in August 2019 when reconsidering his decision, the judge found "there is still a need to prevent further abuse from somebody who hasn't let go. And that's what I found back then on May 21st." The judge also explained at the final hearing that "it's the people who can't let go [who] are the problems." He added that he believed plaintiff sought an FRO for protection and that "she's got that protection in the restraining order." Additionally, although the judge was unable to discern if plaintiff's testimony that defendant had slapped her on prior occasions was true, he expressed concern about her "allegations of slapping in the past" as well as the fact defendant did not want a divorce and had not "moved on." The judge concluded defendant not only slapped his wife but dissembled

about it in his testimony by suggesting "she made my hand hit her face," leading the judge to remark, "It's on that level of ridiculousness that I couldn't accept his testimony." Defendant's refusal to acknowledge and take responsibility for his violent act increased the likelihood of it occurring again, thereby underscoring the judge's finding that plaintiff was in need of the protection an FRO provides. Therefore, the judge determined he could not "allow accidents to happen" and could not "allow situations to occur that may escalate." Further, because the parties have a child in common and defendant was afforded parenting time, the judge emphasized to defendant that his communications with plaintiff had to be limited to emails and " only. . . about the child." The judge reinforced this point, telling defendant his communications "can't be about the divorce proceedings, . . . can't be about getting back together."

In sum, having reviewed the record in its totality, we find no basis to disturb the judge's credibility determinations and are persuaded his factual findings are supported by substantial credible evidence. See Cesare, 154 N.J. at 411-12. All other points raised by defendant lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

A-0131-19