# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1468-24

C.S.,[1]

    Plaintiff-Respondent,

v.

R.O.S.,

    Defendant-Appellant.

_____

Submitted November 6, 2025 – Decided November 25, 2025

Before Judges Marczyk and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-1288-25.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the brief).

Christine M. D'Elia, attorney for respondent.

PER CURIAM

---

[1] We use initials to protect the identities of the parties. R. 1:38-3(d)(10).

Defendant R.O.S. appeals from the December 12, 2024 final restraining order (FRO) entered against him in favor of plaintiff C.S. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Following our review of record and the applicable legal principles, we affirm.

I.

Plaintiff and defendant married in August 2013 but ceased living together in May 2022. Plaintiff filed for divorce in October 2023, which was finalized on October 29, 2024. On October 16, 2024, plaintiff filed a domestic violence complaint alleging defendant committed the predicate acts of sexual assault and harassment.[2] She was subsequently granted a temporary restraining order (TRO).

The trial took place on December 12, 2024. Plaintiff testified defendant came to her home between 8:30 p.m. and 9:00 p.m. on August 30, 2024, to fix her vacuum cleaner, after she had texted him earlier that day asking to borrow his drill so she could fix it herself. Upon his arrival, defendant began to repair the vacuum, however, it later became clear to plaintiff defendant would not be able to finish the repair that evening. Plaintiff stated she did not want defendant to stay, so she told him she was tired and ready for bed to indicate to defendant

_____

[2] The trial court did not address plaintiff's harassment allegation.

he should start packing up to leave. Defendant responded plaintiff could head back to her bedroom while he packed up. Accordingly, plaintiff went to her bedroom and began watching television under the covers of her bed; she remained fully clothed. Plaintiff explained she had expected defendant to come back to her room to let her know when he was done, as he had done before, so she could walk him back out.

Plaintiff testified, however, contrary to her expectation, defendant later came into her bedroom and sat on her bed. She recounted again informing defendant she was tired and wanted to go to sleep, to which defendant responded by telling her to "cut the [television] off," taking off his clothes, and getting under the covers with her. She explained she did not say anything to defendant at that point because she "was afraid that things would get a little bit aggressive" if she confronted him or told him she did not want him to stay. She discussed prior instances when defendant had approached her in bed "with his fists balled and trembling in anger," leading her to believe there was "a possibility that he would raise his hands to [her]." She further explained she opted to hint to defendant he should leave rather than directly telling him to do so because, based on abuse she suffered in a prior relationship, she tended to "shut[] down and try[] to pacify things" to keep herself safe when she felt endangered. Plaintiff

A-1468-24

stated defendant was fully aware she had suffered abuse in the past and that they had previously discussed her particular reaction to danger.

Plaintiff recounted defendant got under the covers of her bed and moved towards her. She testified she was still fully clothed in a maxi dress. She "put [her] hands between [her] legs" and tightened her knees, holding her dress down, which caused defendant to struggle to get her dress up. She explained she did so to try to create distance between her and defendant and to "stop him from getting []to [her] private areas." She testified she began telling defendant "no, . . . stop what you're doing, no, no, no, stop" and tried to pull his chin up from beneath the covers when he tried to access her vaginal area. However, plaintiff asserted she was unable to stop defendant from getting his head between her legs and performing oral sex on her, testifying "[i]t was as if [she] was doing nothing," noting defendant had trained in martial arts and boxing since he was a child. Plaintiff explained, after losing the struggle "to create space" and defendant ignoring her verbal protests, she "eventually just stopped struggling and laid flat to get it over with."

Plaintiff further recalled defendant eventually pushed himself up with one hand, held his penis in the other, and tried to penetrate her vagina. However, she asserted penetration did not occur because defendant could not get erect.

A-1468-24

She testified defendant instead put his head back under the covers and continued to perform oral sex on her. When "he considered himself finished," plaintiff recalled defendant tried to kiss her, but she shoved his head away "and told him no." According to plaintiff, defendant then rolled over and went to sleep in her bed.

Plaintiff asserted she did not consent to any of defendant's actions. She stated she did not call the police that night because she feared defendant would become aggressive while still in her home, explaining he had previously told her "he's never going back" to prison and stating she "would never do something that could injure [herself] with him in the house."

Plaintiff asserted she got up the next morning and told defendant she needed to go to the gym, noting they did not talk about what had happened the previous night. She proceeded to testify about her subsequent interactions with defendant after August 30. On September 6, 2024, plaintiff texted defendant to cancel plans between them, writing she was "[n]ot comfortable about what happened last weekend. It's really been bothering me," and "[g]oing out makes me feel like you will believe that it was ok[ay . . . ] you severely stepped over my boundaries and I don't feel completely safe." Defendant responded, "I can

A-1468-24

come over later to work on your vacuum and we can talk." Plaintiff did not respond.

On September 15, defendant sent plaintiff a $100 electronic payment for her to put towards a credit card he had agreed to pay off. On September 27, defendant texted plaintiff, "I would like to take my beautiful wife out to dinner tomorrow. I'm still crushing on you." Defendant also sent plaintiff jewelry on that date and a letter dated September 26, in which he shared scriptures with plaintiff and stated they were "a map to follow . . . to grow to know, cherish and love my gift that God gave me to be my beautiful wife." Plaintiff testified defendant sent this letter despite her previously telling him those types of letters made her uncomfortable. She explained defendant's gift made her feel "[s]talked, scared, that after all this stuff that's happened, now he's sending me jewelry as if we are in this budding relationship."

On September 29, defendant texted plaintiff asking her to call him. Plaintiff's only response was on September 30, when she texted defendant asking him to take her off their insurance policy. She did not reply to defendant's texts from October 4, which asked her to let him know when he could return to put her vacuum cleaner back together and to let him know when she needed her car

6

inspected.  Plaintiff also did not respond to defendant's text from October 8, where he stated he wanted to talk to his wife.

On October 4, defendant sent plaintiff a letter recounting their wedding vows.  Plaintiff explained this letter concerned her because defendant wrote "till death [do us] part," and because he was asking her not to divorce him.  On October 15, defendant sent plaintiff another letter via email, which spoke about "unconditional love that God wants [them] to have for one another" and informed her "[j]ust know you don't have to have a third divorce."  She explained this email concerned her because it was uncharacteristic of how he showed love throughout their entire marriage, and the parties were only two weeks away from finalizing their divorce.  She testified these communications made her feel "[s]cared" and "[a]s if [defendant's] mental state wasn't intact."  She testified she sought the FRO to ensure her safety, asserting without it, defendant may become "extremely angered, which would cause him to retaliate."  Plaintiff noted defendant had previously stated "he could handle people, like, paying drug addicts something for a quick hit to do his bidding" and knew "how to get rid of his enemies."

On cross-examination, plaintiff admitted she offered defendant something to eat the morning after the alleged sexual assault because that had been her

7

pattern with him. On re-direct, she explained she did not report the alleged sexual assault to the police based on a conversation with her divorce attorney and her desire to not destroy his livelihood as a construction contractor. She explained she "just wanted him to leave [her] alone" so she could "stay safe." However, plaintiff testified she eventually sought the TRO on October 16, because defendant's continued interaction with her made her feel unsafe.

During his direct examination, defendant explained he stayed in touch with plaintiff by texting throughout the divorce process. He conceded he had not had sexual relations with plaintiff since August 2021. Regarding the night of August 30, defendant testified plaintiff advised him he could take his pants off while she was in the living room and he was preparing to eat food he had brought with him. He recounted they had been watching television together, while he was repairing the vacuum cleaner, when plaintiff said she was tired.

Upon plaintiff saying she was tired, defendant recounted helping her turn off the lights around the house. He testified he went into plaintiff's bedroom with her, took off his shirt, and laid down in bed with her. Defendant explained plaintiff got up after a minute to put the roses he had brought her in water. He testified he began to massage and kiss plaintiff when they were in bed, averring it was "playful." He confirmed he did perform oral sex on plaintiff but asserted

8

she did not resist what he was doing and never told him to stop. Defendant confirmed they did not have intercourse following the oral sex, and they both went to sleep afterward.

Following the parties' testimony and summations, the court rendered an oral decision, finding plaintiff established the predicate act of sexual assault. Crediting plaintiff's testimony, the court found "without any doubt[,] . . . this sexual encounter took place, and it was nonconsensual. It was a sexual assault. . . . [P]laintiff did push . . . defendant off. . . . [P]laintiff did say[] [']no, no, no,['] and turned over and tried to push . . . [defendant] away." The court relied not only on plaintiff's testimony but also on her text messages to defendant following the sexual assault, where she noted she was not comfortable about what had happened during the encounter and expressed concerns about her safety. The court observed the encounter took place in the context of the parties not having had sex in nearly three years and during a period when plaintiff wished to end the relationship while defendant sought to preserve it. The court noted, based on plaintiff's testimony, it was "interesting . . . the sexual assault did not get to the point where there was penetration." In response to defense counsel's argument plaintiff had "[b]uyer's remorse" regarding the sexual encounter and therefore fabricated the sexual assault claim, the court noted it

A-1468-24

was "not satisfied that that explanation [wa]s what occurred here." Thus, the court determined plaintiff satisfied her burden of proving the predicate act of sexual assault by a preponderance of the evidence.

As to the second prong of Silver,[3] the court determined plaintiff needed a restraining order "to keep . . . defendant away, to end once and for all the relationship." It found defendant continued to send letters and gifts in an attempt to save their relationship despite the parties living apart and plaintiff filing for divorce. The court noted it seemed plaintiff wanted to end the relationship for a long time, but defendant did not and continued to pursue the relationship by sending plaintiff letters and gifts. It recognized plaintiff's history of domestic violence in a prior relationship impacted the manner in which she responded to defendant's assault. Accordingly, the court entered an FRO against defendant.

## II.

Defendant argues the FRO issued against him should be vacated because the court erred in finding he sexually assaulted plaintiff, as it failed to cite or analyze the applicable law regarding the predicate act at issue, and plaintiff's testimony lacked credibility. Alternatively, defendant contends the court erred in finding an FRO was "necessary to prevent further abuse."

---

[3] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

Our scope of review of Family Part orders is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). We owe substantial deference to the Family Part's findings because of its special expertise in family matters. See Cesare v. Cesare, 154 N.J. 394, 413 (1998). We must "accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C., 463 N.J. Super. at 428 (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). That deference is particularly strong when the evidence is largely testimonial and rests on a judge's credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015).

We will not disturb a trial judge's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)) (internal quotation marks omitted). However, we do not accord such deference to legal conclusions and review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453

11

N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)) (internal quotation marks omitted); see also N.J.S.A. 2C:25-18. The PDVA authorizes judges to issue an FRO against a person "after a finding . . . is made that an act of domestic violence was committed by that person." N.J.S.A. 2C:25-29(a).

"In adjudicating a domestic violence case, the trial judge has a 'two-fold' task." J.D. v. A.M.W., 475 N.J. Super. 306, 313 (App. Div. 2023) (citing Silver, 387 N.J. Super. at 125). "The judge must first determine whether the plaintiff has proven, by a preponderance of the evidence, that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a)." Ibid.

Should the plaintiff prove a predicate act was committed, the second inquiry is whether the judge should enter an FRO "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(]a[)](1) to -29[(]a[)](6)." Ibid.

A.

Defendant argues the court erred in determining plaintiff proved a predicate act under prong one. He avers "the court did not cite or apply the

A-1468-24

governing law requiring an assessment and express findings . . . of the claimed predicate act," which "alone warrants vacating the FRO."

Additionally, defendant argues plaintiff failed to prove the alleged assault occurred "because her testimony was completely incredible." He contends the court acknowledged allowing someone to sleep in the same bed after sexually assaulting them was "not normal." He asserts plaintiff's acknowledgement she did not report the claimed assault to police and did not immediately seek a restraining order undercuts the credibility of her claim. He maintains the emails and texts between him and plaintiff belied her claim because they show plaintiff agreed to go out on a date with him after the alleged sexual assault. Defendant asserts the fact plaintiff recently filed for divorce further weakens her case, because fabricating a domestic violence claim would give her an advantage in that proceeding.

Under N.J.S.A. 2C:14-2(c)(1), an individual is "guilty of sexual assault if the actor commits an act of sexual penetration with another person" "using coercion or without the victim's affirmative and freely-given permission." N.J.S.A. 2C:14-1(c) defines "[s]exual penetration" as including "cunnilingus" and notes "[t]he depth of insertion shall not be relevant." See also State v. Fraction, 206 N.J. Super. 532, 536 (App. Div. 1985) (holding "cunnilingus

constitutes a form of 'sexual penetration' . . . and that insertion of the tongue into the victim's vagina need not be proved").

We conclude the court did not err in its finding plaintiff proved, by a preponderance of the evidence, defendant committed the predicate act of sexual assault. It found, based on the parties' testimony, "without any doubt . . . th[e] sexual encounter took place, and it was nonconsensual." While the court stated, "the sexual assault did not get to the point where there was penetration," it was referring to penile penetration. It clearly found defendant performed oral sex on plaintiff without her "affirmative and freely-given permission." See N.J.S.A 2C:14-2(c)(1). Plaintiff's credible testimony established she did not give defendant her affirmative and freely-given permission to engage in oral sex. Given "sexual penetration" includes "cunnilingus" and the court found the act to be "nonconsensual," the evidence in the record amply supports the court's determination defendant committed the predicate act of sexual assault. See N.J.S.A. 2C:14-1(c).

Although the court did not specifically articulate the elements of sexual assault, plaintiff's testimony, which it found credible, coupled with defendant's admission he performed oral sex on plaintiff and the court's finding there was no consent, was more than adequate to support the court's findings in this matter.

Thus, we discern no basis to disturb the court's conclusion defendant committed the predicate act of sexual assault under the first prong of <u>Silver</u>.

B.

Defendant next argues there was insufficient credible evidence in the record to support the court's conclusion a restraining order was "necessary to prevent further abuse" under prong two of <u>Silver</u>. He avers plaintiff was not entitled to protection under the PDVA because the record establishes the parties were already separated and going through a divorce, plaintiff did not file a police report or seek a TRO until "a long time" after the alleged assault, and plaintiff continued to interact with him after the alleged assault.

Defendant also claims the court did not sufficiently evaluate the factors required under the second prong of <u>Silver</u>. Finally, he contends the court erred in issuing the FRO because "FROs are not supposed to be used as a sword by one spouse against another in the middle of a . . . divorce case." He contends the fact plaintiff sought an FRO against him while seeking a divorce "undercuts the legitimacy of the FRO."

Here, the court determined a restraining order was necessary under prong two of <u>Silver</u> "to keep . . . defendant away" and "to end once and for all the relationship." Although the court did not specifically reference the factors under

A-1468-24

N.J.S.A. 2C:25-29,[4] it is evident the court considered the relevant factors under this statute in reaching its conclusion. It found defendant continued to pursue plaintiff, despite the parties living apart and plaintiff filing for divorce. Further, notwithstanding plaintiff's text messages to defendant she was "not comfortable" and had concerns for her safety based on what happened on the night of the sexual assault, defendant continued to correspond with her. The court also noted plaintiff filed the complaint because she did not know what else to do to stop

---

[4] The factors under N.J.S.A. 2C:25-29 are:

> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment[,] and physical abuse;
>
> (2) [t]he existence of immediate danger to person or property;
>
> (3) [t]he financial circumstances of the plaintiff and defendant;
>
> (4) [t]he best interests of the victim and any child;
>
> (5) [i]n determining custody and parenting time the protection of the victim's safety; [and]
>
> (6) [t]he existence of a verifiable order of protection from another jurisdiction[.]

A-1468-24

defendant from continuing to pursue the relationship, and it was clear defendant did not want to "go away."

Additionally, because the predicate act of sexual assault is violent in nature, plaintiff's need for the FRO in this matter was "self-evident." See Silver, 387 N.J. Super. at 127 (explaining "whether a domestic violence restraining order should be issued[ ]is most often perfunctory and self-evident"); see also Cesare, 154 N.J. at 402 (explaining "one sufficiently egregious action [may] constitute domestic violence under the [PDVA], even with no history of abuse between the parties"). Moreover, plaintiff testified defendant had a history of balling his fists in rage when they had been living together, which led her to leave their marital home. Thus, the court's conclusion the FRO was necessary to protect plaintiff was supported by sufficient credible evidence in the record, and we perceive no reason to second-guess the court's decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

17